Clara SIMS, et al., Plaintiffs,

W.T. Scott, et al., Plaintiffs–Intervenors,

v.

MONTGOMERY COUNTY
COMMISSION, et al.,
Defendants.

Lois JOHNSON, etc., Plaintiff,

v.

MONTGOMERY COUNTY SHERIFF'S
DEPARTMENT, et al., Defendants.

Civ. A. Nos. 3708–N, 82–717–N.

United States District Court,
M.D. Alabama, N.D.

Nov. 27, 1990.

Order Denying Reconsideration and
Clarifying Opinion June 5, 1991.

On Motion to Alter or Amend
June 6, 1991.

Robert D. Segall, Montgomery, Ala., for Montgomery City–County Personnel Bd. and Wade Moss.

George Beck, Baxley, Beck & Dillard, Montgomery, Ala., for Walker Hobbie, Jr. and Bob Smith.

Thomas T. Gallion, III, Haskell, Slaughter & Young, Kenneth L. Thomas, Tyrone C. Means, Massey, Means & Thomas, Montgomery, Ala., for Montgomery County Com'n.

Vanzetta Penn McPherson, Montgomery, Ala., for Scott, intervenors.

Rick Williams, Montgomery, Ala., for Dodson, intervenors.

Joan Van Almen, Balske & Van Almen, Montgomery, Ala.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

In these two longstanding class-action lawsuits, two groups of officers in the Montgomery County Sheriff's Department charge that the department has again illegally discriminated against them because of their sex and race.[1] In *Johnson v. Montgomery County Sheriff's Department*, Civil Action No. 82–717–N, Lois Johnson charges on behalf of herself and a class of female officers (the "Johnson class") that the department has continued to discriminate against them because of their sex. In *Sims v. Montgomery County Commission*, Civil Action No. 3708–N, W.T. Scott and three other named plaintiffs charge on behalf of themselves and a class of African–American officers (the "Scott class") that the department has continued to discriminate against them because of their race. The Johnson and Scott classes rest their claims on a number of legal bases: the prior orders of the court; Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C.A. §§ 2000e through 2000e–17; and the fourteenth amendment to the United States Constitution as enforced through 42 U.S.C.A. § 1983.[2] The Johnson and Scott classes have satisfied Title VII's requirement that they exhaust their administrative remedies before the Equal Employment Opportunity Commission (the "EEOC").

Based on the evidence presented at a nonjury trial spanning over a three-month period, the court concludes that most of the claims of race and sex discrimination have merit and that, accordingly, appropriate individual and class-wide relief is due.[3]

## I. THE JOHNSON LITIGATION

The Johnson class presents a number of different sex discrimination claims against the Montgomery County Sheriff's Depart-

1. The defendants in these two lawsuits include not only the Sheriff's Department but also the county sheriff and various other individuals in the department. The court has treated the department and its officials as one, and thus refers to them all as simply the Sheriff's Department.

The defendants also include the Montgomery County Commission and its members and officials and the Montgomery City–County Personnel Board and its officials. As with the Sheriff's Department, the court has treated the commission and its members and officials as one, and the personnel board and its officials as one. Furthermore, as the court explains later, the commission and the personnel board are appropriate defendants in this litigation for purposes of relief.

2. The Scott class also rests its claims on 42 U.S.C.A. § 1981 as enforced through § 1983.

See *Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (§ 1981 claims against a state actor must be brought pursuant to § 1983). Because § 1981 could not offer the class any more relief than the court otherwise gives, the court does not address whether and to what extent the Scott class's claims have merit under § 1981. See *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (discussing the very limited reach of § 1981).

3. Because the new claims in the *Johnson* case and those in the *Sims* case are very similar and overlap as to evidence in large measure, the court has considered and tried all the claims together. See Order of October 25, 1988, in Civil Action No. 3708–N.

ment. The claims can be grouped as follows: first, class claims that departmental officials assign officers to jobs and shifts based on the officers' sex; second, class claims that male officers in the department have sexually harassed female officers; and, third, individual claims that departmental officials have retaliated against two female officers, Sallie Williams and Johnie Love, because of their participation in this litigation.[4] However, before discussing these claims, the court will give some background information.

## A. *Background*

The Montgomery County Sheriff's Department is divided in two divisions: corrections and law enforcement. The corrections division is responsible for the operation of the Montgomery County Detention Center, also known as the county jail; the law enforcement division is also known as the field division. The personnel structure of the department and its two divisions is as follows:

At the time of trial, the sheriff was Mac Sim Butler, a white male; the chief deputy was Calvin Huggins, a white male; the jail administrator was Willie McKitt, a black male; and the assistant chief deputy was W.J. Walker, a white male.

The county jail has four floors. The first floor is where prisoners are booked; the second floor houses both male and female inmates; and the third and fourth floors house only male inmates. Each floor has at least two "control booths" from which officers can watch inmates; there is also a central control booth. The jail has three job shifts: first shift, from 7:30 a.m. to 4:00 p.m.; second shift, from 3:30 p.m. to 12:00 midnight; and third shift, from 11:30 p.m. to 8:00 a.m.

---

**4.** The parties were able to resolve a number of the claims asserted by the Johnson class, and therefore these claims are not addressed by the court.

Also, by agreement of the parties, the Johnson class has reserved the following additional claims of sex discrimination for later court resolution pending further efforts at settlement:

claims involving hiring and recruitment; claims involving promotions, including how evaluations are done; the individual claims of two Johnson class-members, Angela Brasington and Cathy Stewart; and one of the two individual retaliation claims of Johnson class-member Sallie Williams.

In October 1982, Lois Johnson, then an officer in the corrections division of the Montgomery County Sheriff's Department, filed suit under Title VII charging the department and its officials with discrimination against women in hiring, promotions, transfers, and job and shift assignments. Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the court certified a plaintiff class of all past, present, and future female employees and applicants for employment in the Montgomery County Sheriff's Department. *See Johnson v. Montgomery County Sheriff's Department*, 99 F.R.D. 562 (M.D.Ala.1983) (*"Johnson I"*). In January 1985, the court approved a consent decree resolving all claims brought by the Johnson class. The decree provided for, among other things, new policies with regard to promotions, transfers, and job and shift assignments. *See Johnson v. Montgomery County Sheriff's Department*, 604 F.Supp. 1346 (M.D. Ala.1985) (*"Johnson II"*).[5]

The present phase of this litigation began on October 14, 1988, when the Johnson class filed a motion to compel, charging that the Sheriff's Department and its officials had violated the 1985 consent decree and Title VII. The focus of this phase of the litigation is primarily on the corrections division side of the Sheriff's Department.

**B.** *Claims of Sexually Disparate Treatment, Retaliation, and Harassment*

As the court has stated earlier, the Johnson class charges, first, that departmental officials assign officers to jobs and shifts based on the officers' sex; second, that male officers in the department have sexually harassed female officers; and, third, that departmental officials have retaliated against two female officers because of their participation in this litigation.

1. Claims of Sex Discrimination in Job and Shift Assignments

The Johnson class claims that the Sheriff's Department and its officers have violated both the 1985 consent decree and Title VII in the assignment of jobs and shifts to officers. The consent decree requires that job and shift assignments are to be made without regard to an officer's sex. *Johnson II*, 604 F.Supp. at 1353. The decree provides, however, for three exceptions to this general prohibition. The first two exceptions, which are envisioned by the decree as applying in only "narrow and unusual circumstances," are for "Strip searches" and "Situations which warrant that the privacy interests of the inmate must be protected." *Id.* The third exception is that "A minimum of one female deputy will be on duty in the jail for each of the three shifts." *Id.*[6]

Title VII prohibits sex discrimination in employment, 42 U.S.C.A. § 2000e–2(a),[7] un-

---

**5.** The January 1985 consent decree is attached as an appendix to court's published opinion approving the decree. *See Johnson II*, 604 F.Supp. at 1349–56.

 In July 1986, the court approved a supplemental consent decree. This supplemental decree is not at issue in this litigation.

**6.** Paragraph 3 in the 1985 consent decree provides, in part, as follows:

The Montgomery County Sheriff's Department, its agents, officers and employees and all persons in active concert or participation are hereby enjoined and restrained from discriminating on the basis of sex against any named plaintiff or class member and from failing to implement and comply with the enumerated provisions of this Decree.

*Johnson II*, 604 F.Supp. at 1350. Paragraphs 27, 28, and 31 of the decree provide, in part, as follows:

27. All routine and daily job assignments in all divisions of the department will be made without regard to gender. The exceptions to this rule are:

a. Strip searches (pat down searches if practical)

b. Situations which warrant that the privacy interests of the inmate must be protected.

28. In either of the two above-stated exceptions, the deputy assignment may be made according to the gender of the inmate. These exceptions contemplate narrow and unusual circumstances.

 \* \* \* \* \* \*

31. A minimum of one female deputy will be on duty in the jail for each of the three shifts. *Id.* at 1353.

**7.** Section 2000e–2(a) provides, in part, as follows:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... [or] sex ...; or

less the employer can show that sex is a bona fide occupational qualification, § 2000e–2(e).[8] This exception is satisfied "only if the essence of the business would be undermined" by allowing both men and women to compete on a non-discriminatory basis. *Hardin v. Stynchcomb*, 691 F.2d 1364, 1370 (11th Cir.1982). In addition, where the claimed exception is based on the privacy interests of inmates, the employer must show that, because of the nature of the operation of the business, the job responsibilities cannot be rearranged in a way that would eliminate the clash between the privacy interests of inmates and the equal employment opportunities of all officers without regard to sex. *Id.* at 1371.[9]

The Johnson class claims that the Sheriff's Department violated the consent decree and Title VII in job and shift assignments in the following four ways. First, departmental officials instituted a policy which permits only female correctional officers to be assigned jobs in the section of the county jail where female inmates are housed. Second, the department required that the number of females on each of the three duty shifts in the jail must be "balanced." Third, the department required that a female officer must be accompanied by another officer when in the vicinity of inmates. Finally, the department has discriminated against female officers in the appointment of recreational officers in the jail.

i.

█ In mid-April of 1988, the Sheriff's Department instituted a policy which permits only female correctional officers to be assigned to the county jail's "Two–North" wing where female inmates are housed. The department adopted the policy in response to allegations by several female inmates that one or two male officers assigned to the area had encouraged certain female inmates to undress and model nude. The department continued, however, to assign both male and female officers to the sections of the jail housing male inmates.

The evidence adduced at trial established that the Two–North policy severely restricted employment opportunities for female officers. Because of the limited number of female officers, the department required that they work the Two–North shifts considerably more frequently than they would have otherwise. The female officers, as a result, had significantly fewer opportunities to gain valuable job experience in the other aspects of jail management, such as in the areas where inmates are "booked" and processed. Female officers, especially those with substantial seniority, also had less opportunity to work the more desirable day shift and to have weekends off. In contrast, the male officers were accorded a greater opportunity to be exposed to all facets of jail management, and those with seniority could much more easily than women obtain the best working hours and days.

The Two–North policy is completely unjustified under the consent decree and Title VII. To be sure, issues of inmate privacy are not to be taken lightly, and circumstances may arise in which narrowly drawn sex-based restrictions might be necessary to preserve inmate privacy, as the consent decree recognized with its exceptions for strips searches and situations where the privacy interests of inmates must be protected. *See also, e.g., Hardin v. Stynchcomb*, 691 F.2d at 1373 (an exception to Title VII's broad prohibition against sex discrimination would be where deputies of

---

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race ... [or] sex....

8. Section 2000e–2(e)(1) provides, in part, that it shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of his ... sex ... in those certain instances where ... sex, ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

9. *See also Garrett v. Okaloosa County*, 734 F.2d 621, 622–24 (11th Cir.1984); *Edwards v. Department of Corrections*, 615 F.Supp. 804, 808–09 (M.D.Ala.1985).

the opposite sex would have to conduct strip or body cavity searches). However, the circumstances that gave rise to the Two–North policy could have been effectively resolved through non-discriminatory measures. The evidence reflects that female inmates have complete privacy when taking showers and using toilet facilities.[10] Therefore, the only issue presented to the department was what to do when inmates *deliberately* expose themselves. The evidence reflects that any such misbehavior by inmates can be adequately addressed by disciplining inmates guilty of the conduct and by punishing those correctional officers who encourage such behavior. This policy of simply punishing the guilty is working in the sections of the jail which house male inmates, and there is no reason why it could not work for Two–North as well. Indeed, because the undisputed evidence is that male inmates, much more than female inmates, deliberately expose themselves, the department's justification for the Two–North policy is frivolous. *See Hardin v. Stynchcomb*, 691 F.2d at 1372–74; *Edwards v. Department of Corrections*, 615 F.Supp. 804, 810 (M.D.Ala.1985).

The court does not view the department's justification for the Two–North policy as merely a frivolous defense, however. The policy and its purported justification affirmatively reflect an attitude within the department that the rights of women should not be taken seriously. The fact that departmental officials could so easily, at the first frivolous opportunity, have run roughshod over the rights of female officers reflects that departmental officials have yet to come to grips with the mandate of this court, as embodied in the 1985 consent decree, that female officers of the Montgomery County Sheriff's Department are to enjoy a *full* and *fair* opportunity for equal employment.

Indeed, when the Two–North policy is considered against the backdrop of all the evidence in this case, it is apparent to the court that there is an additional, more sinister motive behind the policy. The court is

convinced that the department's contention that the policy was adopted to protect inmate privacy was not its only motive, if a true motive at all, and that an additional, if not sole, motive behind the policy was a concern that the male officers could not control themselves with female inmates. As the evidence in this case has so dramatically shown—in particular, the evidence of sexual harassment of female officers by male officers which is discussed later in this memorandum opinion—the general belief in the department is, and continues to be, that male officers by nature denigrate and sexually harass female officers. The court believes that those in command believed that, because male officers, including themselves, could not act professionally toward their female co-workers, it would be unlikely that they could act professionally toward female inmates. The Two–North policy was enacted to remove male officers from the temptation of female inmates. That this reason is an additional, if not the only true, reason is evident from the fact that the requirement that the officers and inmates be of the same sex was applied to only the women's section of the jail; it was not applied to the men's sections. If the department had been truly concerned about inmate privacy it would have applied the requirement throughout the jail.

The court believes this motive to be sinister and deplorable for two reasons. First, as stated, it reflects an attitude that the rights of women in the department are easily expendable. When the rights of women clash in any minor way with a perceived concern for the welfare of male officers, the women's rights are readily cast off. But second, and in a sense more sadly, this motive when considered with all the other evidence in this case reflects an attitude on the part of departmental officials that male officers cannot be trusted to be professional in their dealings with women, and, in particular, with female inmates. Women can be trusted to act professionally with male inmates, but men cannot be trusted to act professionally with female inmates. The Two–North policy is, there-

---

**10.** Female inmates are required to wear robes when going to and from the shower, and jail shower stalls are curtained so as to give complete privacy from guards.

fore, demeaning for both men and women in the Montgomery County Sheriff's Department, and should be condemned as intolerably discriminatory as to both groups.

ii.

■ The Johnson class has also challenged the policy of the Sheriff's Department of requiring that the number of females on each of the three duty shifts be "balanced." The department maintains that this policy is necessary, first, in order to prevent any shift from becoming all or predominantly female and, second, because male officers cannot conduct body searches of female inmates. The court agrees with the Johnson class that this policy violates both the 1985 consent decree and Title VII.

The consent decree provides that "A minimum of one female deputy will be on duty in the jail for each of the three shifts." *Johnson II,* 604 F.Supp. at 1353. This provision, when considered with the decree's broad prohibition of job assignments based on sex, means that the Sheriff's Department may discriminate to the limited extent that it may require that one female corrections officer be assigned to each shift. The decree does not authorize the wholesale balancing policy now being used by the department.

■ The balancing policy also violates Title VII because the department's two justifications for the sexually discriminatory policy cannot withstand the Act's scrutiny. First, the fact that male officers cannot conduct body searches of female inmates does not require the policy. The special assignment, where necessary, of at least one female officer to a shift, which is authorized by the consent decree, would adequately meet this concern; an overall balancing policy based on sex is not necessary.

Second, the department's belief that no shift should be predominantly, or all, female does not justify the policy. The department contends that no shift should be overly female because female officers are

by nature not as capable as male officers. According to the department, male officers are in general superior in handling inmates in three respects: patience, ability to communicate, and strength. The department admits that some women are stronger than some men, but contends that when all three factors—in particular, patience and ability to communicate—are considered together male officers are always superior to female officers. Indeed, according to the department, not one female officer in the jail division is as capable as any one of the male officers.[11] These facially discriminatory reasons offered by the department in support of its balancing policy are obviously insufficient to meet Title VII's exacting requirements for a bona fide occupational qualification. Indeed, the fact that the department would even offer these reasons demonstrates that the department's discriminatory attitude is both broad and deep and that the court must carefully and cautiously consider any justification the department might offer in support of a policy which has a discriminatory impact on female employees.

iii.

■ The Johnson class claims that the Sheriff's Department has in several other ways treated female officers differently from male officers in violation of Title VII and the 1985 consent decree. First, female corrections officers have been instructed that, when they are in the vicinity of inmates in the jail, they must be accompanied by at least one other officer. For example, a female officer is required to be accompanied by another officer when walking down the halls in those parts of the jail where inmates are housed; she is also required to have a second officer present when she has an inmate clean a control booth. The evidence reflects that the department adopted this policy because, in the words of the supervisor responsible for the policy, "Well, I feel males can take care of them-

---

11. Admittedly, much of the above evidence came from the testimony of one witness. This witness, however, is the Administrator of the Jail, Willie McKitt. Moreover, because neither the sheriff, chief deputy, nor any other ranking officers have disputed McKitt's view of the role and ability of women in the Sheriff's Department, the court concludes that they all share his view.

selves better than females." [12] This facially discriminatory policy is not authorized by the consent decree, and thus violated the decree. The policy also violates Title VII because the only reason offered by the department in support of the policy is that male officers can handle inmates better than female officers and this justification is, as the court has already explained, itself repugnantly discriminatory.

Second, the department has openly discriminated against female officers in the appointment of recreational officers for the first and second shifts in the jail. Recreational officers are responsible for taking inmates to the jail's recreational area and supervising their recreation. The court finds that the department has intentionally restricted the number of women who may be assigned to these positions and that the reason behind this restriction is the belief that female officers are not as capable and competent as male officers. The court condemns the department's actions and finds that they violate the consent decree and Title VII for the same reasons that the court has rejected the department's other conduct which was based on the same discriminatory belief.[13]

### 2. Sexual Harassment Claims

The Johnson class also charges the Montgomery County Sheriff's Department with sexual harassment. From the evidence presented, the court agrees that the charge has merit.

#### i.

■ The Supreme Court has explained that "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1988). This is true because the supervisor singles out the subordinate because of her sex. Sexual harassment is, therefore, a form of sex discrimination, and as such, falls within Title VII's prohibition of employer discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C.A. § 2000e–2(a)(1).[14] For the same reason, sexual harassment also falls within the 1985 consent decree's prohibition of employer discrimination "on the basis of sex against any named plaintiff or class member."[15]

■ Courts have in general recognized two forms of sexual harassment: explicit sexual overtures that are directly linked to employment opportunities or conditions, known as "*quid pro quo* harassment"; and conduct that creates a hostile or offensive work environment, known as "hostile environment harassment." *See generally Henson v. City of Dundee*, 682 F.2d 897, 908–

---

**12.** Transcript at 153 & 65. At various points in the trial, the department appeared to suggest that the fact that this statement was made by a female supervisor somehow ameliorated the discriminatory nature of the comment. As this court has previously noted, one "would have to be truly naive to assume that women cannot sexually discriminate against women and that many women do not harbor stereotypical, limited views of themselves." *Jordan v. Wilson*, 649 F.Supp. 1038, 1059 n. 15 (M.D.Ala.1986). *See also Castenada v. Partida*, 430 U.S. 482, 499, 97 S.Ct. 1272, 1282, 51 L.Ed.2d 498 (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group").

**13.** It appears that the department no longer enforces the policy that female officers are to be accompanied by another officer when in the vicinity of inmates. The department has also apparently ceased its policy of restricting the opportunity of female officers to serve as recreational officers. Indeed, the dramatic increase in the number of women who have recently served as recreational officers is firm evidence of the fact that the department was discriminating in the past.

These two policies are nonetheless still subjects of this litigation, first, because the department carried them out even though they were clearly prohibited by the consent decree and, second, because the court believes that, in light of the department's evident discriminatory attitude toward female officers and its recent history of discrimination against them, it is very likely that the department would reinstate the two policies.

**14.** *See* note 7, *supra.*

**15.** *See* note 6, *supra.*

913 (11th Cir.1982) (*quid pro quo* harassment); *id.* at 901–06 (hostile environment harassment). To establish the latter, a plaintiff need not demonstrate a "tangible loss" of "an economic character," *Meritor Savings Bank*, 477 U.S. at 64, 106 S.Ct. at 2404,[16] but rather need only show that the conduct is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* 477 U.S. at 67, 106 S.Ct. at 2405, *quoting Henson*, 682 F.2d at 904. Moreover, the severity and pervasiveness of the conduct does not turn merely on how many or how few incidents there are; a court must examine "not only the frequency of the incidents, but the gravity of the incidents as well." *Vance v. Southern Bell Telephone and Telegraph Co.*, 863 F.2d 1503, 1511 (11th Cir.1989).

■■■■ In addition, "the fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense," *Meritor Savings Bank*, 477 U.S. at 68, 106 S.Ct. at 2406; rather, the "gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Id.* The focus of the court should be on whether the complainant "by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation ... was voluntary." *Id.* Finally, *quid pro quo* harassment and

hostile environment harassment are not mutually exclusive notions. The same conduct may partake of both forms of harassment. For example, sexual overtures directly linked to employment may be so pervasive or so offensive as to create a hostile environment.[17]

The Supreme Court has explicitly held, however, that an employer may not be held "automatically liable" for all sexual harassment inflicted, or suffered, by its employees. *Meritor Savings Bank*, 477 U.S. at 72, 106 S.Ct. at 2408. The Court explained that Title VII required that lower courts look to common-law agency principles, but with the understanding that these "principles may not be transferable in all their particulars to Title VII." *Id.* Relying on *Meritor Savings Bank*, the Eleventh Circuit Court of Appeals has concluded that employers may be held *directly* liable for any illegal harassment that either it or its agents may have practiced on its employees. *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1557–58 & n. 4 (11th Cir.1987). The *Sparks* court observed that Title VII expressly provides that an "employer" is liable for its own sexual harassment of its employees, 42 U.S.C.A. § 2000e–2(a),[18] and that the Act defines the term "employer" to include its "agent," § 2000e(b).[19] *Id.* The appellate court then explained that, because Title VII does not

---

**16.** *See also Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 905 (11th Cir.1988) (per curiam).

**17.** The EEOC has defined sexual harassment as follows:

Harassment on the basis of sex is a violation of Sec. 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11(a) (footnote omitted).

**18.** *See* note 7, *supra.*

**19.** Section 2000e(b) provides as follows:

The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and *any agent of such a person*, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26, except that during the first year after March 24, 1972, persons having fewer than twenty-five employees (and their agents) shall not be considered employers. (Emphasis added.)

define the term "agent," courts must turn to established common-law agency principles found in the Restatement (Second) of Agency §§ 219–237 (1958) ("Restatement"). *Id.*

Relying on these principles, the *Sparks* court then indicated that a supervisor is acting as an agent for Title VII purposes when he acts "within the scope" of his authority. *Id.* at 1558 n. 5, *quoting* Restatement § 219(1). A supervisor acts within the scope of his employment when his conduct is of the kind he is employed to perform, occurs substantially within the authorized time and space limits, and is actuated, at least in part, by a purpose to serve his employer. *Id. citing* Restatement § 228(1). A supervisor's conduct is not within the scope of his employment if it is "different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve" his employer. *Id. quoting* Restatement § 228(2).

The *Sparks* court further held that a supervisor is acting as an agent for Title VII purposes when "he [is] aided in accomplishing [the harassment] by the existence of the agency relationship." *Id.* at 1559, *quoting* Restatement § 219(2)(d). Under this latter provision of the Restatement, § 219(2)(d), the employer "is not insulated from liability by the fact that [its supervisor] was acting entirely for his own benefit." *Id.* at 1559. Rather, an employer should be held liable under such circumstances "because it was the employer's delegation of authority that empowered the supervisor to act." *Id.*

A supervisor need not necessarily be high in the business structure, nor does he have to have the authority to hire, fire, or promote in order to be considered an agent whose conduct is binding on an employer under the above principles. A supervisor who has much less authority and is merely in the business's intermediate structure can be an agent for Title VII purposes. *Vance*, 863 F.2d at 1515. In determining whether a person acts in either a supervisory or agency capacity, a court must examine "the circumstances of the

particular employment relationship and the job functions performed by the individual." *Id. quoting* 29 C.F.R. § 1606.8(c). "While the supervisor's direct authority over the plaintiff must be considered as a relevant factor," the appellate court explained, "courts should also examine any evidence bearing on the overall structure of the workplace, including the relative positions of the parties involved." *Id.* at 1515. Whether a person is in a position to be considered an agent for Title VII purposes is a factual issue for the factfinder.

Under the law of the Eleventh Circuit, an employer may also be held *indirectly* liable for sexual harassment. To establish indirect liability, the plaintiff must show under the theory of *respondeat superior* that the employer "knew or should have known of the harassment in question and failed to take prompt remedial action." *Sparks*, 830 F.2d at 1557, *quoting Henson*, 682 F.2d at 905. Indirect liability reaches those circumstances where the person who has engaged in the unlawful conduct is not the plaintiff's "employer" or "agent" as these terms are used in Title VII but rather is, for example, "one of plaintiff's co-workers or [is] a supervisor with no authority over plaintiff." *Sparks*, 830 F.2d at 1558 n. 4. A plaintiff can prove that the employer knew of the harassment by showing that the harassment was open or pervasive enough to charge the employer with constructive knowledge. *Vance*, 863 F.2d at 1512. A plaintiff may also prove an employer's knowledge by showing that she complained to higher management. *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir.1988) (per curiam). Of course, there must be some avenue by which an employee can make the employer aware of the illegal conduct. An employer should not be able to avoid *respondeat superior* liability by simply not giving its employees an opportunity to come forward with their claims of harassment.

Applying the above principles, courts have found that, because *quid pro quo* harassment is directly linked to employment opportunities, an employer is

usually directly liable for such conduct. *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir.1989). A supervisor would usually have to be an "employer" or "agent," as those terms are defined above, in order to be in a position to inflict *quid pro quo* harassment. In contrast, an employer may be subject to either, or both, direct and indirect liability for hostile environment harassment, depending on whether the environment is a product of harassment by the victim's supervisor and thus partakes of *quid pro quo* characteristics, or is merely the product of a co-employee's harassment and thus constitutes "pure" hostile environment harassment. *Compare Steele*, 867 F.2d at 1316–17 *with Sparks*, 830 F.2d at 1560 n. 9. *See also Huddleston*, 845 F.2d at 904–05.[20]

■ These not-so-simple principles for determining employer liability are further complicated by the suggestion of the Supreme Court and the Eleventh Circuit "that an employer may be insulated from liability for hostile working environment sexual harassment where (1) the employer has an explicit policy against sexual harassment, and (2) it has effective grievance procedures 'calculated to encourage victims of harassment to come forward' that the plaintiff did not employ." *Sparks*, 830 F.2d at 1560, *quoting Meritor Savings Bank*, 477 U.S. at 73, 106 S.Ct. at 2408. *See also Vance*, 863 F.2d at 1513–14.

ii.

■ Applying the above principles, the court concludes that sexual harassment in the Montgomery County Sheriff's Department has permeated all ranks, from the lowest level corrections officers and deputy sheriffs to the sheriff himself, and is so pervasive and severe as to render the working conditions in the department psychologically intolerable for female officers. The court further concludes that this harassment springs in large measure from the fact that the department has adopted and operates under a policy by which female officers are treated as inferiors who are not to be taken seriously, but rather are to be either tolerated or viewed as objects of pleasure and ridicule for the male officers in the department. Although the evidence is replete with credible instances of sexual harassment to support these conclusions, the court will relate only a few instances.

For example, Sheriff Mac Sim Butler is himself guilty of sexual harassment. The evidence reflects that, in an effort to satisfy his sexual desires, Sheriff Butler put a low ranking female communications dispatcher through an emotionally harrowing experience which at times left her frightened, humiliated, and helpless. In October of 1987, Butler asked a female dispatcher to join him in getting some coffee and cake. As they went into the coffee room, Sheriff Butler approached the dispatcher, and, in her words, "[h]e put his hands down my side and on my buttocks."[21] The dispatcher said nothing because, in an effort to "rationalize" what had happened, she concluded that Butler had acted "unintentionally."[22] However, a few days later, Butler approached her again and asked her if her telephone number was listed. She told him that it was not. Butler then responded "that his wife had been away on a Friday night" and that if he had her number he would have telephoned her and they "could have gotten together."[23] Although the dispatcher still showed no interest in him, Butler approached her again a day or two later and asked her for her telephone number. She did not respond.

After the dispatcher realized that Butler had, indeed, intended to touch her intimately and that he was interested in her, she became very upset. Butler had already

---

**20.** Because the concepts of *quid pro quo* harassment and hostile environment harassment overlap significantly, courts should avoid the temptation to determine employer liability based simply on whether the challenged conduct is labelled as one or the other. Courts should instead determine employer liability based on a searching and detailed factual review of the conduct itself rather than on how the conduct is labelled.

**21.** Transcript at 1660.

**22.** *Id.*

**23.** *Id.* at 1661.

ignored her efforts to make known to him, indirectly and diplomatically, that his sexual advances were not welcome. She was concerned that, if she confronted him and rejected him in direct terms, she might lose her job. The dispatcher was not aware of any grievance procedure, and she did not know to whom she could turn for help. She talked to a number of fellow officers and employees, including Sheriff Butler's secretary. Butler's secretary suggested that she stay away from him as much as possible. The dispatcher considered consulting an attorney, but decided that any lawsuit would result in her word against Butler's and that it would be very unlikely that a judge or jury would believe her over a county sheriff. After much anguish and on the advice of a fellow officer, she mustered enough courage to confront Sheriff Butler and tell him she was not interested in him. To her relief, Butler did not retaliate against her.

The court is convinced that Sheriff Butler was fully aware that his sexual advances were not welcome; the court is further convinced that Butler was hopeful that the dispatcher would nonetheless be reluctant to reject him because of his authority over her. In other words, Butler knew that he was abusing his supervisory authority when he continued to force himself on her. To be sure, the dispatcher eventually rejected Butler, and Butler did not retaliate against her. However, the court believes that a female officer, out a deep fear that she might lose the source of her livelihood, could very understandably have given in to him. The fact that the dispatcher in this instance did not capitulate and that Butler ultimately did not retaliate against her does not render Butler's conduct any less reprehensible and intolerable under Title VII. The dispatcher just happened to be courageous enough not to allow him to take advantage of her subordinate status.

The administrator of the county jail, Willie McKitt, is also guilty of unsavory and unwelcome sexual advances towards female officers. Beginning in 1986, he sexually harassed a female corrections officer, often in front of other officers. Shortly after the female officer came to the corrections division, McKitt called her "fat ass." [24] The female officer corrected McKitt by telling him her name, but McKitt ignored her response. On a later occasion, McKitt grabbed her buttocks. She told him not to touch her, but he just laughed and said "If you had been nicer to me, me and you could meet and had something going on by now." [25] He added that "Your husband won't know." [26] On another occasion, McKitt wrote "FA" on a note pad in her view, laughed, and walked off. On another occasion, McKitt approached her as she was standing up and said "Look at that ass.... It's so fat and firm ... It's not like the rest of these flabby asses around here ... I just know it's soft." [27] And on yet another occasion, when she went to McKitt's office to pick up her check, he said in front of another officer, "Look at all that fat ass.... Look at all that fat ass. You can even have my check." [28]

The corrections officer was, in her words, "hurt," "demeaned," "degraded," "afraid," "ashamed," and made to "feel like I'm about that tall." [29] She was afraid that if she complained to anyone, McKitt would find out and she would lose her job. Like the female dispatcher, she felt completely helpless because the sexual harassment was coming from her supervisor. Moreover, like Sheriff Butler, Jail Administrator McKitt was fully aware that the female corrections officer viewed his remarks as unwelcome, and that she was afraid to complain because of fear of retaliation.

This conduct of Sheriff Butler and Jail Administrator McKitt is doubly intolerable—first and obviously, because it was

24. *Id.* at 306.

25. *Id.* at 308.

26. *Id.*

27. *Id.* at 307.

28. *Id.* at 312.

29. *Id.* at 310.

done without regard to the feelings and humanity of those whom they supervised; but second, also because it was done based on an authority which the public has entrusted to them to be used by them to *uphold* the law, not *violate* it. The victims of their conduct were therefore not just the two women they harassed but the public as a whole.

The department's harassment of female officers was not, however, limited to these two higher-ups. Indeed, the higher-ups set the stage for the other male officers; they created an environment in which all men in the department could feel free to engage in sexual harassment at their pleasure. Men at all levels engaged in such conduct. For example, Officer D.R. Rigby asked to come to a female officer's apartment and said he wanted her "sitting there in a towel when he got there."[30] On another occasion, Officer Billy Ray Sims grabbed a female officer's buttocks. The female officer complained about Sims to McKitt, but he took no action other than to put a notice on a bulletin board prohibiting male officers from touching female officers. The female officer decided not to take her complaint to Sheriff Butler because she reasonably concluded that she "couldn't get any results there."[31]

In another incident, Officer Robert Singleton, while intoxicated, touched two female officers in an improper way. Under the pretext of looking to see whether the women had guns on them, Singleton, in the words of one female officer, "started patting and squeezing me from the ... back by touching me closely under my upper arms and going down toward my waist."[32] Singleton also, in the words of the other female officer, "put his hand around my neck in a massaging manner."[33] The two women filed a complaint against Singleton charging him with sexual harassment and intoxication, and a disciplinary review board, consisting of McKitt and two other officers, was convened to hear it.[34] To add insult to injury, the board perverted the disciplinary process into a tool to harass the women further. First, the board treated the women as if they had done something wrong, as if they should be faulted for Singleton's sexual advances and should not have complained about them. Second, the board found that, although Singleton had touched the two women, the touching did not constitute sexual harassment because he did it out of "friendliness."[35] Finally, the board recommended that the two women, although they had done nothing wrong, be "counselled" along with Singleton for sexual harassment, drinking on the job, and showing improper respect for superior officers; in other words, both the offender and the offended were treated the same.[36] Sheriff Butler adopted the recommendation of the disciplinary review board.

On another occasion, a male officer intentionally left a bathroom door open so as to expose himself to a female officer. The female officer filed a formal complaint, but the male officer was only counselled by his supervisor and no disciplinary review board was convened. In another incident, two male officers undermined the authority of a female officer, who had just been named officer of the year, by openly making disparaging remarks about her private sex life. They were neither counselled nor disciplined.

Officer Melvin Turner retaliated against two female officers after they rejected him personally. Turner retaliated against a female officer whom he had befriended when he learned that she was going to marry someone else. He waited until almost two days before her wedding to give her leave

---

**30.** *Id.* at 1674.

**31.** *Id.* at 244.

**32.** Scott exhibit 91.

**33.** *Id.*

**34.** The Sheriff's Department's rule that a disciplinary board must consist of officers ranking at least as high as the accused officer ensured

that Singleton would go before an all-male board, because the highest ranking women in the department at that time was a lieutenant.

**35.** Transcript at 2486.

**36.** *Id.* at 2494.

to take time off for her wedding, even though she had applied for it two months earlier and had continually and alarmingly reminded him of her request as her wedding day approached. She previously had been able to obtain vacation leave easily and without any problem. Turner continued to retaliate against the officer after her marriage by restricting most of her work to a control booth and not allowing her to work in booking as she wanted to do. Turner retaliated against another officer who refused to respond romantically to him by specially scheduling her to work at a time so that she could not keep a previously arranged date with another man.

The court has so far focused on harassment which has sexual overtones. However, to be actionable under Title VII, the conduct giving rise to a hostile or offensive work environment need not consist of sexual advances or have clear sexual overtones. *Bell v. Crakin Good Bakers, Inc.,* 777 F.2d 1497, 1503 (11th Cir.1985).[37] Conduct of a nonsexual nature which, for example, ridicules women or treats them as inferior, can constitute prohibited sexual harassment. Applying this principle, the court concludes that because the department's policies regarding job and shift assignments for women—in particular, its "Two-North" policy and its "balancing" policy—are, as the court has explained, so clearly illegal under the 1985 consent decree and Title VII and are so overtly demeaning to women in the department, the policies can only be viewed as part of the department's overall intentional scheme to create a hostile and offensive environment for its female officers.[38] Without question, the shift and job assignments policies and the male officers' sexual advances spring from the same conscious discriminatory bias: that female officers are not co-equals with male officers and are to be viewed as only objects of ridicule and sexual pleasure.

Other evidence of non-sexual harassment includes an incident where Jail Administrator McKitt received a letter from some inmates complaining that they were being treated badly by two female officers because the officers were pregnant. McKitt completely ignored departmental procedures prohibiting the putting of inmate complaints in officers' personnel files, and put the inmates' letter in the two officers' personnel files without telling them. In contrast, when female inmates filed the much more serious complaint that led to the Two-North policy—that male officers were encouraging female inmates to pose nude—McKitt threw the inmates' letter "in the waste basket."[39] The court is convinced that McKitt, because of his strong bias against women working in the county jail, was intentionally trying to build-up a negative file on the two female officers merely because they were women.[40]

The court has also limited its discussion so far to sexual harassment that occurred after the 1985 consent decree. The Sheriff's Department contends, and the Johnson class agrees, that only these discriminatory acts are actionable. However, the law is well established that evidence of prior acts "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977); *Jordan v. Wilson,* 649 F.Supp. 1038, 1046 (M.D.Ala.1986). Prior act evidence is especially important in a sexual harassment case because the issue for the court is not merely whether there was harassment but whether the harassment was so pervasive or severe as to create an abusive working

---

**37.** *See also McKinney v. Dole,* 765 F.2d 1129, 1138–39 & nn. 20–21 (D.C.Cir.1985); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir.1987).

**38.** However, the court would reach the same result without including harassing conduct of a nonsexual nature on the part of officers in the department.

**39.** Transcript at 1369.

**40.** McKitt further indicated his bias against women when, in discussing a recent escape attempt by an inmate, he quickly pointed blame at the female officer as being the "weak link," even though the evidence established the blame for the attempted escape lay squarely on the shoulders of a male officer who failed to follow proper procedures.

atmosphere. *Meritor Savings Bank*, 477 U.S. at 67, 106 S.Ct. at 2405. Recent acts of harassment could take on a harsher or more oppressive reality when considered against a backdrop of prior harassment.

Here, there is substantial evidence of incidents of sexual harassment before entry of the consent decree in 1985. For example, Officer Billy White continuously made unsavory and unwelcome sexual comments to three female dispatchers. The women complained to Sheriff Butler. White's behavior stopped, but only temporarily, after Butler informed him of the women's complaint. The women decided not take any further action because it appeared that the department did not take sexual harassment claims seriously. In another incident that occurred prior to 1985, Jail Administrator McKitt asked a female officer when she was "gonna do this or give him any," and "when are you gonna give me some pussy." [41] He would also at times attempt to undo the top button of her uniform shirt. When she refused to agree to his desires, he retaliated against her by placing her on the midnight shift and singling her out for unjust disciplinary treatment. Another woman "lost respect" for McKitt because he was constantly "making passes" at her and other female officers.[42] Because he appeared to be "very serious" when he made his passes, the officer felt "intimidated." [43] In the officer's words, "you just didn't really know what would happen, if you would end up on third shift or what would happen. By him being the officer in charge, you just didn't know." [44] Even male officers sometimes found themselves unwillingly entangled in McKitt's sexual escapades. One male officer who lived alone allowed McKitt to use his apartment for sexual trysts in order "to try to get along with him." [45]

 Finally, in determining whether the sexual harassment reflected in the evidence violates the 1985 consent decree and Title VII, the court has not limited its perspective and assessment to the effect of the harassment on the intended individuals, that is, the persons at whom it has been directed. A person may be a victim of sexual harassment without being its intended victim; the challenged conduct need not be directed at the complaining individual. *Waltman v. International Paper Co.*, 875 F.2d 468, 477 (5th Cir.1989). A woman who was not herself the object of sexual harassment would have a claim if she worked in an environment in which harassment was pervasive. *Broderick v. Ruder*, 685 F.Supp. 1269, 1278 (D.D.C.1988). Applying this principle, the court concludes that the harassment practiced on certain women in the Sheriff's Department has created an intolerably offensive and hostile environment not only for these women but for all female officers in the department. The harassment has been so open and so pervasive that the victims are the entire Johnson class of employees. Indeed, the court believes that the victims here also include those male officers who harbor a respect and concern for all their fellow officers, irrespective of their sex, and who find offensive to their conscience, and thus intolerable, an environment in which all officers, regardless as to their sex, cannot share equally in the opportunities of employment.

### iii.

 The court further concludes that the Montgomery County Sheriff's Department is itself liable for the sexually offensive and hostile working environment its male officers have created. The court need not try to pigeon-hole the Johnson class's claims of sexual harassment in order to determine whether the department can be held liable. Regardless of whether the challenged conduct is characterized as *quid pro quo* sexual harassment or as hostile environment harassment, or whether the concepts of agency or *respondeat superior* are applied, the Johnson class is entitled to

---

**41.** Johnson's exhibit 11 at 84.

**42.** Johnson exhibit 16 at 134.

**43.** *Id.* at 135.

**44.** *Id.*

**45.** Johnson exhibit 12 at 120.

prevail against the department. In other words, the department is liable under all of the various theories of liability previously discussed by the court.

First of all, the Sheriff's Department is directly liable under both notions of agency previously discussed. The court finds that under the circumstances in this case several of the perpetrators of the sexual harassment—in particular, Jail Administrator McKitt—were actually acting within the scope of their authority under § 219(1) of the Restatement when they engaged in the illegal conduct. The evidence convinces the court that the department has a policy of discouraging women from remaining in the department and seeking advancement—in particular, in the corrections division—and that sexual harassment was simply a way of furthering that policy. This policy is based on a belief by departmental officials, as explained earlier, that women should not be officers because they are less capable than men physically and mentally, and sexual harassment furthered this policy by making it as uncomfortable and unpleasant as possible for women to remain officers in the department. The court further finds that the perpetrators of the sexual harassment were, within the conceptual confines of § 219(2)(d) of the Restatement, aided in accomplishing their sexual harassment by their supervisory authority over their victims. Finally, the court finds as to both notions of agency—that is, under both §§ 219(1) and 219(2)(d)—that the perpetrators of the sexual harassment possessed sufficient authority from the department over their victims to be considered supervisors or agents of the department.

The department is also indirectly liable under the theory of *respondeat superior* for the sexual harassment by both the supervisors and co-employees of the victims of the harassment. Not only was the sexual harassment so open and pervasive that all those in supervisory authority should have known about it, the key supervisors in fact did know about the harassment because they were themselves perpetrators.

█ The Sheriff's Department offers the defense that it should not be held liable because the victims of sexual harassment in the department failed to take advantage of available avenues for relief, both within and outside the department. The department contends that sex discrimination and, in particular, sexual harassment are prohibited in the department by provisions in an Employee Handbook published by the Montgomery County Commission [46] and provisions in the Rules and Regulations of the Montgomery City–County Personnel Board.[47] The department further contends that any female officer who felt that a male officer had violated these provisions could have sought relief from four sources: by pursuing a complaint through the "chain of command" within the department; by invoking the procedures of the department's "disciplinary review board";[48] by seeking help from the Montgomery County Commission Administrator;[49] and by filing a complaint with the

---

**46.** The handbook provides, in part, as follows:
Our employees are a most important asset to us and the County. We are committed to the requirement that all employees are treated fairly and in a non-discriminating manner and without regard to an employee's race ... [or] sex....
Defendants' exhibit 121 at 1.

**47.** The personnel board's rules and regulations provide, in part, as follows:
Discrimination on the basis of ... sex ... is prohibited except where ... sex ... constitute[s] a bona fide occupational qualification necessary to proper and efficient administration.
Defendants' exhibit 3 at 21.

**48.** *See* Johnson Exhibit 24 at 10–13.

**49.** The Employee Handbook published by the Montgomery County Commission provides, in part, as follows:
The City–County Personnel Board serves as the mediator for employee grievances on personnel matters. If an employee feels that they have not obtained sufficient satisfaction after consulting their Supervisor/Department Head, they may submit a request for consideration to the City–County Personnel. The County Commission Deputy Administrator *will assist Supervisors/Department Heads* and employees on resolving problems and answering questions on County employee rights, benefits, needs, and personnel procedures. Supervisors and appointing authorities should make every effort at the departmental level to resolve any conflict, disagreement, work problem, etc. No one will in any way use

Montgomery City–County Personnel Board.[50]

As the court explained earlier, the Supreme Court and the Eleventh Circuit have suggested that an employer may be insulated from a claim of hostile environment harassment if the employer has an explicit policy against sexual harassment and if it has effective grievance procedures calculated to encourage victims of harassment to come forward. Here the evidence reflects that the Sheriff's Department not only has no explicit and unequivocal policy against sexual harassment, it condones and encourages such harassment. Counsel for the department notes that the County Employee Handbook and the Rules and Regulations of the City–County Personnel Board together prohibit sexual harassment. The evidence reflects, however, that the Sheriff's Department has not viewed these prohibitory provisions as applying to it. First, it is apparent from the conduct of the department's top supervisors—in particular, Sheriff Butler and Jail Administrator McKitt—that they do not consider sexual harassment as illegal and prohibited in the department. Second, the department has not made known to its employees that these provisions apply to them, and thus most of its employees are unaware of the provisions. Finally, it is open to serious question whether these prohibitory provisions even apply to the Sheriff's Department. The testimony at trial indicated that, because the sheriff of the county is a constitutionally elected official, his department is somewhat autonomous and, thus, the authority of the County Commission and the City–County Personnel Board probably does not extend over grievance matters in the Sheriff's Department.

Furthermore, the department clearly does not have procedures which are, in the words of the Supreme Court, "calculated to *encourage* victims of harassment to come forward." *Meritor Savings Bank*, 477 U.S. at 73, 106 S.Ct. at 2408 (emphasis added). Indeed, the department's procedures are hostile to such claims. The "chain-of-command" procedures are not open to claims of sexual harassment. To pursue such procedures, a victim of harassment would have to go through such sexually biased and hostile individuals as Sheriff Butler and Jail Administrator McKitt. A victim could obviously not obtain a fair and impartial review from these men.[51] The "disciplinary board review" process is also not open to such claims. Administrator McKitt appoints the members of the board and often serves on it himself. Such a board could not conceivably provide a fair and impartial means of review. For example, as this court has previously described, two women filed a complaint of sexual harassment against Officer Robert Singleton, only to have the disciplinary board, consisting of McKitt and two other male officers, conclude that the sexual touching of females is appropriate as long as it is friendly, and to have Sheriff Butler accept

threats, coercion, or intimidation to deter an employee from filing a request for consideration with the City–County Personnel Department.
Defendants Exhibit 121 at 2.

**50.** The Rules and Regulations of the Montgomery City–County Personnel Board provide, in part, as follows:

A permanent employee may submit at any time a written statement to the head of the *department regarding any situation related to* employment status or condition of employment. The department head and appointing authority shall give the employee full opportunity to present views and shall take such action as deemed proper. If the employee desires a written request for a review by the Personnel Board of the [sic] to employment may be made except in instances where the right of appeal is prohibited by Act 2280. The Personnel Board shall have investigated such requests and if required or requested hold an informal hearing within twenty (20) days after the request on such questions. Within ten days after concluding the hearing, the Personnel Board shall certify its findings and order to the authority from whose action the appeal was taken. Such official shall then affirm, revoke or modify the action taken so as to conform with the findings and order of the Board. The findings and order of the Personnel Board shall be final and conclusive.
Defendants' exhibit 3 at 27–28.

**51.** *Cf. Solomon v. Royal Oak Township,* 842 F.2d 862, 866 (6th Cir.1988) (noting the futility of taking a complaint through the chain-of-command when the employee's supervisor is the object of that complaint).

the board's recommendation that the two female victims along with Singleton be "counselled" for harassment. It is apparent that most male officers in the Montgomery County Sheriff's Department—in particular, Sheriff Butler and Jail Administrator McKitt—neither know what conduct constitutes "sexual harassment" in violation of the consent decree and Title VII, nor do they perceive conduct which violates the decree and the Act as serious infractions.[52] The department apparently does not understand that the issue is not whether the male officers view the touching of female officers as friendly, but rather whether the female officers could reasonably consider it "unwelcome." *Meritor Savings Bank*, 477 U.S. at 68, 106 S.Ct. at 2406.

■■■■ The Montgomery County Administrator also does not offer an adequate means for redress of complaints of sexual harassment. The administrator's authority is limited to mediation; he does not have authority to resolve complaints of discrimination. In any event, the department never made known to its employees that the administrator is available to hear complaints of sexual discrimination, and most employees are unaware of him as an avenue of help. Finally, the City–County Personnel Board is not a means of review. Employees of the Sheriff's Department have never viewed the personnel board as place to resolve grievances; and, moreover, it appears that, while the board has some

authority over hiring and firing, it probably has no authority over grievance matters within the Sheriff's Department and thus cannot resolve grievances raised by its employees.

### 3. Retaliation Claims

The Johnson class claims that officials of the Sheriff's Department have impermissibly retaliated against two female officers, Sallie Williams and Johnie Love, because of their participation in this litigation. Title VII expressly protects employees from retaliation by their employer for engaging in protected activity under the Act.[53] The 1985 consent decree has similarly provisions against retaliation.[54] For the reasons that follow, the court concludes that Williams and Love have not been victims of retaliation.

■■■ The method of establishing a retaliation claim is essentially the same as for a claim of race or sex discrimination. *Donnellon v. Fruehauf Corporation*, 794 F.2d 598, 600–01 (11th Cir.1986). An employee has the initial burden of establishing a *prima facie* case of unlawful discrimination or retaliation by a preponderance of evidence, which once established raises a presumption that the employer has engaged in proscribed conduct: either race discrimination, sex discrimination, or retaliation. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Many different articulations of a *prima facie* case exist, varying

**52.** Indeed, McKitt informed the court at trial that he would not believe that a woman had been a victim of sexual harassment unless there was a third-party present to confirm the charge. In other words, in a swearing match between a male and a female, he would always believe the male.

**53.** 42 U.S.C.A. § 2000e–3(a), the anti-retaliation provision in Title VII, provides, in part, as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in

any manner in an investigation, proceeding, or hearing under this subchapter.

**54.** Paragraph 4 in the 1985 consent decree states:

Defendant shall not engage in or be a party to any act, policy or practice which has the purpose or effect of discriminating or retaliating in any manner against the plaintiff, any employee or former employee or any applicant for employment because that employee has furnished information or has participated in any respect in the prosecution of this action, or because the employee has made charges, testified, asserted a claim, or participated in any manner in the investigation or proceedings under 42 U.S.C. § 2000e *et seq.* or any regulations promulgated thereunder.

*Johnson II*, 604 F.Supp. at 1350.

with the context of the employment decision and the type of proscribed practice involved. The essence of the *prima facie* case is that the employee presents circumstantial evidence sufficient to generate a reasonable inference by the factfinder that the employer used prohibited criteria in making an adverse decision about the employee. The unifying themes of the various manifestations of the *prima facie* case in the context of race and sex discrimination are that the employee is a member of a protected group and that the employer has treated that employee differently from other members outside that protected group under the same or similar circumstances, to the employee's detriment.[55] *Dunning v. National Industries, Inc.*, 720 F.Supp. 924 (M.D.Ala.1989). The test for a *prima facie* case of retaliation is, however, somewhat different. An employee must show that she was engaged in protected opposition to Title VII discrimination; that she suffered adverse treatment simultaneously with or subsequent to such opposition; and that there was a causal link between the protected opposition and the adverse treatment. *Donnellon v. Fruehauf Corporation*, 794 F.2d at 600–01.

■ If the employee establishes a *prima facie* case, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer discriminated or retaliated against the employee. The employer may do this by articulating a legitimate, non-discriminatory and non-retaliatory reason for the employment decision, which is clear, reasonably specific and worthy of credence. The employer has a burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. *Burdine, supra.*

■ Once the employer satisfies this burden of production, the employee then has the burden of persuading the court that the proffered reason for the employment decision is a pretext for discrimination or retaliation. The employee may satisfy this burden by persuading the court either directly that a discriminatory or retaliatory reason more than likely motivated the employer or indirectly that the proffered reason for the employment decision is not worthy of belief. By so persuading the court, the employee satisfies her ultimate burden of demonstrating by a preponderance of the evidence that she has been the victim of unlawful discrimination or retaliation. *Burdine, supra.*

■ However, where, as in this case, a court has conducted a full hearing and has sufficient evidence to make a determination of whether an employee has been a victim of discrimination or retaliation, the court need not go through the above burden-shifting process and may instead go ahead and reach the ultimate issue of discrimination or retaliation. *See United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 713–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403; *Powers v. Alabama Department of Education*, 854 F.2d 1285, 1290 (11th Cir.1988), *cert. denied*, 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989). Nevertheless, in addressing the retaliation claims which follow immediately and the race and sex discrimination claims which follow in later sections of this memorandum opinion, the court has at times borrowed parts of the *Burdine* approach—in particular, the way in which *Burdine* handles whether something is a pretext—to assist in determining whether a claim has merit.[56]

■ Love and Williams claim that, in the fall of 1988, officials in the Sheriff's Department retaliated against them be-

---

55. *See, e.g., Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir.1989) (discipline); *Wu v. Thomas*, 847 F.2d 1480, 1483–84 (11th Cir.1988) (promotion), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989); *Taylor v. Hudson Pulp and Paper Corp.*, 788 F.2d 1455 (11th Cir. 1986) (transfer), *cert. denied*, 484 U.S. 953, 108 S.Ct. 345, 98 L.Ed.2d 371 (1987).

56. *See Dunning v. National Industries, Inc.*, 720 F.Supp. at 929–30 n. 7 ("The *Burdine* analysis provides an invaluable method of weighing and considering evidence," as long it is "not applied too rigidly" and is not "viewed as an end in itself").

cause they filed affidavits in support of this litigation. Love and Williams allege that they were given less desirable schedules and that they were prohibited from eating in the detention facility "control booths" shortly after they filed these affidavits. In addition, Love complains that departmental officials retaliated against her by forcing her to wear a heavy brown county-issued jacket rather than allowing her to wear her own light brown windbreaker that she had worn for the previous three and one-half years. Both Love and Williams clearly engaged in an activity, the filing of affidavits in this litigation, which is protected by Title VII and the 1985 consent decree. The dispute therefore turns on whether the two female officers suffered adverse employment decisions because of their protected actions.

The court finds from the evidence that the department's recent prohibitions against eating in the control booth and wearing personal jackets were not in any way grounded in a retaliatory motive. The policy against eating in the control booths was instituted because the booths were often left messy. Love was required to wear a county-issued jacket so that her outer apparel would be same as all other officers, and the Sheriff's Department's rule that all corrections officers wear department-issued clothing so that they can be easily identified as officers is clearly reasonable. Moreover, these two rules applied to all officers, not to just Williams and Love. Williams and Love have not been victims of retaliation in this regard.

■ Love also charges that, in November 1988, Lieutenant Melvin Turner changed her off-days from Saturdays and Sundays, the most desirable combination, to Sundays and Mondays. Williams charges that in that same month Turner changed her off-days in a way that resulted in her losing holiday overtime pay. The evidence is confusing as to the mental calculus that went into these changes. The court need not, however, attempt to clear up this confusion because, even if there is no completely reasonable explanation for the changes, the court is still convinced that Turner acted in good faith and that Williams and Love have not been victims of retaliation. After carefully reviewing the circumstances which led up to the changes, the court believes, and finds, that Turner reasonably and in good faith believed at the time the changes were made that they were necessary to provide adequate around-the-clock staffing within the strict financial constraints of the department. *See Moore v. Sears, Roebuck & Co.,* 683 F.2d 1321, 1323 n. 4 (11th Cir.1982) (to conclude that the asserted reason was not pretextual, the court need not determine that defendant was correct in its assessment of plaintiff's performance but need only determine that defendant in good faith believed plaintiff's performance was unsatisfactory).

■ In employment litigation such as this, where the decisions of an employer extending over a long period of time and covering many employees are at issue, both the court and the parties must keep in mind that the decision-makers are humans and not computers. The fact that two or three of the hundreds of administrative decisions an employer makes cannot be explained with mathematical precision does not necessarily mean that those employees adversely affected are victims of discrimination or retaliation. Indeed, the court believes that, if counsel for the Johnson class had the time, she could find numerous employment decisions for which there is no reasonable explanation, affecting not only Williams and Love but most if not all subordinate officers. Williams and Love and all other participants in this litigation must therefore recognize that those administrative decisions which they perceive to be, and indeed may very well be, unfair to them are not all necessarily products of a discriminatory or retaliatory motive.

### C. *Relief*

■ Because the Johnson class has prevailed in part, it is entitled to appropriate relief. First, the class is entitled to a permanent injunction prohibiting the Sheriff's Department from enforcing the following policies: the Two–North policy, the shift

"balancing" policy, and the policy requiring that a female officer must be accompanied by another officer when in the vicinity of inmates. The department should also be enjoined from discriminating against female officers in the assignment of jail recreational officers.

■ Second, the Johnson class is entitled to a permanent injunction prohibiting the department and all its officers, present and future, from engaging in sexual harassment—both *quid pro quo* harassment and hostile environment harassment—of female officers. The court agrees, however, with the Johnson class that a prohibitory injunction is inadequate to address the sexual harassment in the department. The department must also be required to take affirmative steps to rid the department of its current sexually hostile atmosphere. The Johnson class has suggested a number of extensive measures to do this. The court believes, however, that the Sheriff's Department should first have an opportunity to fashion such measures and propose them to the court. The primary responsibility for complying with the law regarding employment discrimination lies with employers. The court will, therefore, give the department two months to submit to the court a temporary plan and a year to submit a permanent plan, each designed to address sexual harassment in the department. The temporary plan must include, at a minimum, the following: a prohibition of all forms of sexual harassment in the department; effective grievance procedures calculated to encourage victims of harassment to come forward with their complaints; and a program to educate all officers in the department about the law and their obligations under the law regarding sexual discrimination, including, in particular, sexual harassment. The grievance procedures in the temporary plan must allow alleged victims of harassment to have their complaints heard by persons who are not in any way biased against women and who have not themselves engaged in sexual harassment. These procedures must also not be in any manner subject to the control or influence of those who are biased against women, including those who have themselves engaged in sexual harassment of women.[57]

Finally, the Johnson class is entitled to recover reasonable attorney's fees and expenses. 42 U.S.C.A. § 2000e–5(k). The court will give the parties an opportunity to agree to such fees and expenses.

## II. THE SCOTT LITIGATION

As stated, the Scott class's claims of race discrimination and retaliation arise out of the aspect of this litigation styled *Sims v. Montgomery County Commission*, civil action no. 3708–N. *Sims* began in 1972, when three African–American persons brought suit against the Montgomery County Commission[58] and various county entities and officials, charging that the hiring and promotion procedures used by the county discriminated against black persons.[59] A year later, in 1973, the court entered a consent decree submitted by the parties that required that "all hiring and personnel practices, programs and procedures" must be conducted "on a non-discriminatory basis without regard to race, color, creed or national origin."[60] The 1973 decree also set forth specific procedures to govern recruitment, hiring, promotions, and job classifications. The de-

**57.** The Johnson class has also suggested that one or more of its members may be entitled to nominal damages of one dollar for the harassment they have suffered. Because the class, including the victims of harassment, is receiving broad injunctive relief, the court has assumed that the class would view nominal damages as unnecessary. *See Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 905 (11th Cir.1988) (per curiam) (harassment victim, who is no longer employed with defendant and thus not entitled to prohibitory injunction, may be enti-

tled to nominal damages); *Henson,* 682 F.2d at 905 (same).

**58.** The Montgomery County Commission was then known as the Montgomery County Board of Revenue.

**59.** *See Sims v. Montgomery County Commission,* 686 F.Supp. 878 (M.D.Ala.1988) (discussing partial history of *Sims* litigation.

**60.** Order of March 22, 1973.

cree applied to all county jobs, including those in the Sheriff's Department.

The Scott phase of the *Sims* litigation began two years ago, on May 26, 1988, when four African–American officers in the Sheriff's Department, W.T. Scott, Melvin Turner, Addie Berry, and Cinda Brown, moved to intervene, charging that the department was continuing to discriminate against black officers in the department. The court allowed the new plaintiffs to intervene. Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the court later certified a new plaintiff class, the Scott class, consisting of all past, present, and future black officers in the Sheriff's Department.[61] The Scott class has presented a number of different claims of race discrimination and retaliation against the department. The claims can be grouped as follows: individual and class claims of disparate treatment, retaliation, and harassment and class claims of disparate impact. The Scott class rests its disparate impact claims on Title VII, and the remainder of its claims on the 1973 consent decree and Title VII as well as on the fourteenth amendment as enforced through § 1983.[62] However, before discussing these claims, the court must first address the department's affirmative defense of the statute of limitations.[63]

### A. *Affirmative Defense*

The Sheriff's Department offers an affirmative defense through which it seeks to limit its exposure to liability to the Scott class. It asserts that the Scott class's § 1983 claims should be limited to those that accrued within two years prior to intervention by the new plaintiffs in the *Sims* litigation.

Scott and the other new plaintiffs intervened in the *Sims* litigation on May 26, 1988.[64] At that time, clear precedent in the Eleventh Circuit provided that actions brought in Alabama pursuant to § 1983 were to be governed by a six-year statute of limitations found at § 6–2–34(1) of the 1975 Alabama Code. *Jones v. Preuit & Mauldin* ("*Jones I*"), 763 F.2d 1250 (11th Cir.1985), *cert. denied*, 474 U.S. 1105, 106 S.Ct. 893, 88 L.Ed.2d 926 (1986). Thus, at the time that Scott and the other new plaintiffs intervened in this litigation, they were entitled to recover for any claims accruing from May 26, 1982, forward.

On January 10, 1989, the Supreme Court held that actions brought under § 1983 in a state with more than one statute of limitations are governed by the state's residual personal injury statute of limitations. *Owens v. Okure*, 488 U.S. 235, 249–50, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989). Shortly thereafter, the Eleventh Circuit Court of Appeals held that the effect of the Supreme Court's holding was to overrule the 1985 decision, *Jones I*, by establishing a two-year limitations period found in § 6–2–38(*l* ) of the 1975 Alabama Code. *Jones v. Preuit & Mauldin* ("*Jones II*"), 876 F.2d 1480, 1483 (11th Cir.1989) (en banc).[65]

■■■ The department argues that, given the presumption that judicial decisions will apply retroactively to all pending cases, *Gulf Offshore Co. v. Mobil Oil Co.*, 453 U.S. 473, 486 n. 16, 101 S.Ct. 2870, 2879 n. 16, 69 L.Ed.2d 784 (1981), this court should honor *Owens* and limit the § 1983 claims of the Scott class to those accruing within two years, that is, after May 26, 1986. The

---

**61.** Order of November 2, 1988.

**62.** *See* note 2, *supra* (discussing why the court does not address independently the Scott class's reliance on § 1981).

**63.** The department has also raised a number of other affirmative defenses—for example, res judicata and release—as to some of claims that certain individual members of the Scott class might later raise in these proceedings. Because these claims are not now before the court, the court has not considered these other affirmative defenses.

**64.** Scott, Turner, Berry, and Brown moved to intervene on May 26, 1988, and the court granted their motion on June 16, 1988. The court allowed intervention as of May 26, when the motion was filed.

**65.** *See also Foster v. Board of School Commissioners*, 872 F.2d 1563, 1567 n. 4 (11th Cir.1989); *cf. Owens*, 488 U.S. at 246 n. 9, 109, S.Ct. at 580 n. 9 (citing § 6–2–38(*l* ) as an example of the appropriate statute of limitations to be applied).

court rejects the department's argument for two reasons. First, the department has waived any affirmative defense based on the two-year statute of limitation found in § 6–2–38(*l*). Through and including the time of the entry of the pretrial order and of the trial, the department joined the Scott class in maintaining that the six-year statute of limitations was applicable. The Scott class therefore conducted discovery and prepared its individual and class claims based on the six-year period. The department did not raise the two-year statute until the first day of trial. Because the Scott class relied on the six-year period throughout the course of the pretrial proceedings, expending its time and energy and setting its trial strategy based on the longer period, the class would be unfairly prejudiced if, on the eve of trial, the court were to allow the department to raise this defense which it had previously waived. Moreover, the department has offered no excuse as to why it did not attempt to preserve a defense of a two-year or one-year limitations period, in view of the fact that *Owens* was pending in the Supreme Court during the pretrial proceedings in this court. The department has also failed to make any showing that it would be unfairly prejudiced by application of the longer statutory period; there is nothing in the record to indicate, for example, that evidence has been lost. *See Miles v. Tennessee River Pulp and Paper Co.,* 862 F.2d 1525, 1529 (11th Cir.1989) (defense not made in pretrial order is considered waived unless "manifest injustice" results).

Second, looking to Supreme Court precedent and the most recent opinion of the Eleventh Circuit in *Jones II,* the court concludes that the § 1983 claims of the Scott class extend back to at least 1984. In 1985, the Supreme Court in *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), determined that its earlier method for choosing the applicable state statute of limitations for § 1983 actions was in error and that henceforth a federal court should

choose the state statute applicable to other personal injury torts. The result of this decision was to change the applicable statute of limitations in § 1981 and § 1983 actions in most federal jurisdictions. Predictably, the question of whether *Wilson* and the new statutes of limitations resulting from the decision should be given retroactive effect commanded a good deal of attention in federal courts.

In both *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), and in *Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), the Supreme Court addressed the retroactivity question.[66] Although the Court reached different results in the two cases, its analysis is highly illuminating. In *Goodman,* the Court of Appeals for the Third Circuit opined that *Wilson* mandated a change in the applicable statute of limitations used in § 1981 cases brought in Pennsylvania federal courts. Moreover, because there was no clear Third Circuit precedent at the time that the *Goodman* plaintiffs filed their complaint, the appellate court held that the new limitations period, determined pursuant to *Wilson,* should be applied retroactively. The effect of this decision was to shorten the limitations period from six to two years.

The plaintiffs argued before the Supreme Court that the circuit court's decision to require retroactive application was in error. In making their argument the plaintiffs relied upon the three-part balancing test established in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 105–08, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971), which requires a court to determine (1) whether the decision sought to be applied retroactively established a new principle of law and overruled clear circuit precedent upon which litigants may have relied, (2) whether the underlying purpose behind the substantive change in the limitations period would be served by retroactive application, and (3)

---

**66.** Although both of these cases concerned retroactive application of a change in the applicable statute of limitations for causes arising under § 1981, the analysis is directly applicable to

§ 1983 cases as well. *See Jones II,* 876 F.2d at 1483 (citing both *Goodman* and *St. Francis College*).

whether retroactive application would be equitable to the parties. The Supreme court disagreed with the plaintiffs' contentions, holding that, because the law was unsettled as to the applicable statute of limitations at the time the plaintiffs filed their complaint in 1973 and because there was thus no clear precedent on which plaintiffs could have relied, the decision to give retroactive effect to *Wilson* and its progeny was proper under the *Chevron* analysis. *Goodman*, 482 U.S. at 552–63, 107 S.Ct. at 2621–22. Moreover, the Court concluded that such a decision would be consistent with *Wilson*'s mandate and would not result in inequitable treatment to the parties.

The Supreme Court again utilized *Chevron*'s three-part test in *St. Francis College* to affirm a Third Circuit decision holding that the change in the applicable statute of limitations should not be given retroactive effect, in marked contrast to *Goodman* which was decided during the same term. Similarly to *Goodman*, *St. Francis College* arose in Pennsylvania and concerned the issue of whether federal courts should honor the six-year statute of limitations held in effect at the filing of the complaint, or whether the new two-year statute of limitations was applicable. However, in contrast to *Goodman*, the law of the Third Circuit at the time that the *St. Francis College* complaint was filed in 1980 clearly established that a six-year statute of limitations was applicable in § 1981 actions. Because a change in the applicable statute of limitations represented a clear break from precedent upon which the plaintiff was entitled to rely and because the change would thus create serious harm to the plaintiff if applied retroactively, the six-year statute of limitations was applied in the litigation. *St. Francis College*, 481 U.S. at 608–09, 107 S.Ct. at 2025–26.

A few basic principles can be distilled from *Goodman* and *St. Francis College*. First, the court must determine whether the parties *relied* on some principle of law. The clarity of the law of the circuit at the time of the action's filing is of utmost importance in making this determination. Next, the second *Chevron* factor concerning whether retroactive or prospective application would further the purpose of the chosen statute of limitations is seldom determinative of the issue. If prior precedent was unclear and thus there was no reliance on clear precedent, this factor favors retroactive application to establish a uniform statute of limitations;[67] but if the precedent was clearly established upon which the parties were entitled to rely, this consideration is considered to be either neutral,[68] or possibly militating against a wholesale adoption of retroactive application of the change in the limitations period.[69] As to the latter, the Eleventh Circuit has indicated that in those circumstances were the intervening decision overruling clear precedent mandates application of "a shorter statute of limitations," a court should not give retroactive effect to the new decision because retroactivity would deny "injured parties who had relied on a longer limitations period ... access to the federal courts." *Jones II*, 876 F.2d at 1484. Applying these principles here, the court concludes that the Scott class is entitled to present to the court any claims that arose after January 9, 1984.

The Eleventh Circuit has stated that, "prior to 1985, a one-year limitations period applied in Alabama to section 1983 actions based on employment discrimination." *Foster v. Board of School Commissioners*, 872 F.2d 1563, 1566 (11th Cir.1989). Furthermore, this pre–1985 circuit precedent compels the conclusion that on January 9, 1985, when Alabama replaced its one-year statute, § 6–2–39(a)(5) of 1975 Alabama Code, with a two-year statute, § 6–2–38(*l*),

---

**67.** *Baker v. Gulf & Western Industries, Inc.*, 850 F.2d 1480, 1482 (11th Cir.1988); *Williams v. City of Atlanta*, 794 F.2d 624, 627–28 (11th Cir.1986).

**68.** *E.g.*, *Jackson v. City of Bloomfield*, 731 F.2d 652, 654–55 (10th Cir.1984); *Al-Khazraji v. St. Francis College*, 784 F.2d 505, 513 (3rd Cir.1986),

*aff'd* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987).

**69.** *See, e.g., Foster v. Board of School Commissioners*, 872 F.2d at 1566–67; *Anton v. Lehpamer*, 787 F.2d 1141, 1145 (7th Cir.1986).

this new two-year statute applied to employment discrimination claims. Therefore, when *Jones I* was later decided on June 21, 1985, it established a "new rule" that a six year limitations applied to such claims, *Foster*, 872 F.2d at 1566; it "overruled clear precedent" that Alabama's one-year statute, followed by its superseding two-year statute, applied to these claims. *Id.*

 All plaintiffs, including the members of the Scott class, had every reason to believe that they could wait until any time within six years of a violation to file a § 1983 claim which arose after *Jones I* or which had not expired before the appellate decision; in other words, they had every reason to rely on *Jones I*. To hold otherwise would be to hold, in effect that a plaintiff, who allegedly was injured by the unconstitutional acts of a defendant, must also bear the brunt of errors of the Eleventh Circuit. Moreover, because the law in this circuit was clearly established, such a result would bring a windfall to the defendant accused of wrongdoing, who like the plaintiff believed that the limitations period was six years. The same cannot be said, however, for claims which expired before *Jones I* was decided. Neither plaintiffs nor defendants had reason to rely on a six-year limitations period for these claims. *Jones II*, 876 F.2d at 1484.

 According to the following logic, these latter claims would be all those that arose before January 9, 1984. First, because the new statute went into effect only five months before *Jones I* was decided, those claims to which Alabama's then-newly-enacted two-year statute applied would have been alive and unextinguished when *Jones I* was decided on June 21, 1985. Second, in order for a claim to have become subject to the two-year statute it must

have been alive on January 9, 1985, when the new statute went into effect. The rule in Alabama is that a claim that is already barred by a preexisting statute of limitations will not be revived by a newly enacted, longer limitations period. *See Bajalia v. Jim Magill Chevrolet, Inc.*, 497 So.2d 489, 491 (Ala.1986); *Tyson v. Johns–Manville Sales Corp.*, 399 So.2d 263, 269 (Ala. 1981) (per curiam). Third, only those claims arising after January 9, 1984 would fall into this category. Those claims arising before this date would have been extinguished by Alabama's one-year statute. Those claims arising after January 9, 1984, are entitled to *Jones I*'s six-year period and, thus, are viable in this litigation.

### B. *Claims of Racially Disparate Treatment, Retaliation, and Harassment*

 The Scott class has brought a number of individual and class claims of racially disparate treatment, retaliation, and harassment against the Montgomery County Sheriff's Department. Title VII,[70] the fourteenth amendment through § 1983,[71] and the 1973 consent decree[72] all prohibit racial discrimination and harassment. Title VII[73] and the consent decree[74] also prohibit retaliation. Previously, the court explained how a court should consider claims of race and sex discrimination and claims of retaliation based on disparate treatment. The court concluded that where it has conducted a full hearing and has sufficient evidence to make a determination of whether an employee has been a victim of discrimination or retaliation, it need not go through the *Burdine* burden-shifting process but may instead go ahead and reach the ultimate issue of discrimination or re-

---

**70.** *See* note 7, *supra* (setting forth some of the proscriptive provisions in Title VII).

**71.** *See Hamilton v. Rodgers*, 791 F.2d 439, 442 (5th Cir.1986), abrogated in others respects by *Harvey v. Blake*, 913 F.2d 226, 228 n. 2 (5th Cir.1990).

**72.** The 1973 consent decree provides that "The Defendants shall conduct all hiring and personnel practices, programs and procedures on a

non-discriminatory basis without regard to race, color, creed or national origin."

**73.** *See* note 53, *supra* (setting forth some of the proscriptive provisions in Title VII).

**74.** The court's order approving the 1973 consent decree provides that "The Defendants shall not discriminate or retaliate in any manner against any employee or applicant who has participated in any respect with this action."

taliation. The court again does that here with regard to the individual claims in the Scott litigation. Furthermore, the legal analysis applicable to a charge of racial harassment is analogous to the standards applied to "hostile environment" sexual harassment. In other words, racial harassment is actionable under the law where, under the totality of the circumstances brought out at trial, racial harassment is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Vance v. Southern Bell Telephone and Telegraph Co.*, 863 F.2d 1503, 1510–11 (11th Cir.1989). Previously, the court discussed a number of legal principles and concepts courts should use in determining whether a plaintiff has established a claim of hostile environment harassment and whether an employer is liable for such harassment. The court will apply the same legal principles and concepts to the Scott litigation.

### 1. Background History of Racial Discrimination in the Sheriff's Department

The claims of the Scott class cannot be fully understood without some knowledge of the history of race discrimination in the Montgomery County Sheriff's Department. Many of the claims challenge discriminatory practices and customs which both directly and indirectly have roots in this history. To be sure, in assessing these claims, the court is limited by the applicable statutory limitations period. But this restriction does not prohibit use of evidence outside the limitations period for historical purposes. As long as the evidence is relevant to viable claims, the court may consider background evidence that pre-dates the applicable limitations period. *Bazemore v. Friday*, 478 U.S. 385, 401–04, 106 S.Ct. 3000, 3009–10, 92 L.Ed.2d 315 (1986); *United Airlines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977); *Jordan v. Wilson*, 649 F.Supp. 1038, 1046 (M.D.Ala.1986).

Mac Sim Butler, who has served as sheriff of Montgomery County, Alabama since 1954, hired his first African–American officer in 1968. Before then, Butler and the Sheriff's Department refused to hire black persons solely because they were black. Butler did, however, recruit a number of blacks to serve as "special" deputies to assist with "black social functions"; he also used these "special deputies," in the mid–60's during the height of the "civil rights movement," to assist in handling civil rights disorders. These black deputies, who were recruited merely because they were black, were mere volunteers and not employees of the department.

In 1988, 20 years after Butler hired his first African–American officer, the racial make-up of the Sheriff's Department raises a strong suspicion that the department has not truly begun to redress its past discriminatory practices; indeed, the evidence before this court reflects that, in many ways, the department has consciously perpetuated them. In a county that is over 30% black in population, no black person as of 1988 had ever been promoted on the enforcement side of the department; no black officer had ever supervised a white officer in the enforcement division. Moreover, only five persons have been promoted on the corrections side. In addition, to compound this bleak picture, it appears that blacks are not only restricted to the lowest rank, they are also concentrated in the corrections division of the department, the less prestigious of the department's two divisions. Fifty-nine or 77% of the 76 officers in corrections were black; and only 15 or 19% of 78 officers in enforcement were black.

### 2. Racial Assignment of Officers to Cars and Neighborhoods

One of the most patent vestiges of the Sheriff's Department's racial history is Sheriff Butler's continued policy of assigning officers to patrol cars and to neighborhoods based on the officers' race. Beginning with the first African–American deputy in 1968 and up until the initiation of this litigation in 1988, the department has in general assigned black officers to serve as car partners with only black officers, and white officers to serve as car partners with white officers. The department has in general also assigned black officers to work in

the predominantly black west side of the City of Montgomery and white officers to the predominantly white east side. White supervisors explained to a black officer, who had only black partners between 1977 and 1987 and who had been assigned to the west side exclusively, that the reasons behind the discriminatory policy were two: first, only blacks "would work on the west side"; and, second, "y'all could talk to them better than we can" and "y'all can get anything out of them on that side."[75] The court believes this policy was also based on a belief that black officers should not patrol the wealthier, white neighborhoods on the east side of the city. The department has, therefore, consciously perpetuated its racially discriminatory policies of the past and continued to treat black officers as only "special" officers, restricted mainly to dealing with black people, and not as full-fledged law enforcement officers for *all* the people of the county, both black and white. Moreover, in those limited instances where the departmental officials have reluctantly assigned black officers to ride with white officers, they have made known that it would be particularly objectionable for white female officers to ride with black male officers; the same strong objection was not voiced for black females riding with white males. The department has not attempted to justify this discriminatory policy as some bona fide occupational qualification. 42 U.S.C.A. § 2000e–2(e).[76] The policy is instead clearly violative of Title VII, the fourteenth amendment as enforced through § 1983, and the 1973 consent decree.[77]

Moreover, that the department would so overtly and unabashedly continue such an invidious and demeaning policy into these modern times reflects that the department and its officials still view black persons as inferior, second-class citizens and that this view is broad and deep in the department;

it further reflects that the department and its officials have yet to come to grips with the fact that, under the law of the land, blacks and whites are to be treated equally, without regard to their race or color.

3. Individual Claims of Racially Disparate Treatment, Retaliation, and Harassment

Named plaintiffs W.T. Scott, Melvin Turner, Addie Berry, and Cinda Brown have a number of individual claims in which they charge the Sheriff's Department with racially disparate treatment, retaliation, and harassment, in violation of Title VII, the fourteenth amendment as enforced through § 1983, and the 1973 consent decree.

i.

■ W.T. Scott, who has been with the Sheriff's Department since 1983, claims that departmental officials disciplined him because of his race and in retaliation for his having filed charges of discrimination with the EEOC. Scott was disciplined for commenting to another deputy during jury selection in a Montgomery County court that a juror had a criminal record. At the time, Scott was working as a court security officer. A third officer overheard Scott's comment and reported it to the prosecutor in the case. The prosecutor looked into the matter and learned that the juror did not have a criminal record; the trial was not, however, disrupted or impeded as a result.

This third officer filed a formal complaint against Scott, and the complaint went before a disciplinary review board. When Chief Deputy Calvin Huggins learned of the complaint against Scott, he called Scott into his office. Scott told Huggins that he would not make a statement and that Huggins should speak to his attorney. The disciplinary review board unanimously recommended to Sheriff Butler that Scott be dismissed. Sheriff Butler, how-

**75.** Transcript at 2623.

**76.** *See* note 8, *supra.*

**77.** The department has recently ceased its policy of assigning officers to cars and neighborhoods based on the officers' race. The policy is nonetheless still the subject of this lawsuit because it

has been enforced since the 1973 consent decree even though it is clearly prohibited by it, and because the court believes that, in light of the department's past and present history of racial discrimination, it is still likely that the department will reinstate the policy.

ever decided to reduce Scott's punishment by transferring him out of the court security unit to another unit. In contrast, when a white male officer was charged with actually discussing a pending case with a juror and talking to a defendant about his guilt or innocence, Huggins granted the white male's request for a transfer out of court security and did not process the complaint through a disciplinary review board.

The department contends that Huggins did not give Scott the choice of a transfer without a disciplinary board review because Scott refused to give Huggins a statement and Huggins believed he had no choice but to proceed with the board review. Huggins knew, however, who Scott's attorney was and had worked with her in this litigation. Huggins or the department's attorneys could have easily called Scott's attorney and resolved the complaint against him without disciplinary board review. Moreover, the court cannot overlook that the white male's offense of directly tampering with the judicial process was substantially more serious than was Scott's casual remark. Scott was treated differently only because he is black and because he had filed charges of discrimination with the EEOC.

█ W.T. Scott also claims that the department retaliated against him by refusing to transfer him to the investigation unit in the department's enforcement division. In March 1986, Scott complained to Sheriff Butler that no black officers had ever served as investigators in the field; he requested a transfer to the investigation unit. Butler denied Scott's request, stating that no funding was available for an additional investigator in the unit. Less than a year later, the department decided to appoint two blacks to the unit. However, instead of choosing Scott, the department recruited two other black officers in the field to transfer to investigation.

The department says that Scott was not selected for two reasons: first, because he did not submit a written request to transfer; and, second, because he had less seniority than the other two officers. Butler's contention that Scott was not selected

because he failed to file a written request is frivolous. The department frequently allows transfers without written requests. Moreover, the two black officers who were transferred filled out written request forms only after they had been recruited for the transfers. Butler was fully aware of Scott's interest in a transfer to investigations, and could have similarly asked him to fill out a form. Butler's contention that Scott did not receive the transfer based on seniority is also pretextual. As stated, Butler was fully aware that Scott desired to be in the investigation unit, and that he was qualified to be in the unit. Instead of simply transferring Scott, Butler recruited other blacks of greater seniority. Other officers who sought to transfer in the department were not subjected to a similar treatment; they did not have to compete in seniority with other officers who had not themselves initially sought to transfer but had been recruited. Butler did not give the transfer to Scott because he had complained to Butler about the absence of blacks in the investigation unit.

█ Scott also claims that the department discriminated and retaliated against him in training. This claim is meritless. The department says that Scott was denied permission to participate in a three-month training program with the Air National Guard because he requested permission to go less than one week before the training was to begin and only two days before he needed a response from Sheriff Butler. He also did not provide a statement from his military commander that he needed to attend the program. The court finds that these reasons are not pretextual and are the reasons why Scott was denied training. Scott was not denied training with the Air National Guard for a discriminatory or retaliatory reason.

ii.

█ Melvin Turner, who has been with the Sheriff's Department since 1973, claims that, in 1983, the department refused to promote him to the rank of captain in the jail. That year, the department promoted a white male to the position of assistant jail

administrator, which carries the rank of captain. The department says that it promoted the white male instead of Turner for two reasons: first, because the white male had more "time in rank" than Turner; and, second, because Jail Administrator Willie McKitt, who is black, recommended the white male for the position. The court finds both of these reasons to be pretextual, and that Turner has been a victim of intentional racial discrimination.

In 1983, the department promoted based on seniority in the department, not on time in rank. Because Turner had much more overall seniority than did the white male, he should have received the promotion. The department deviated from regular procedures when it relied on time in rank. Furthermore, the department's decision to turn to McKitt for his opinion as to who was the more qualified was similarly a deviation from normal procedure. As long as the officer with most seniority was qualified, that officer was promoted. McKitt said that Turner was qualified. The department's decision to compare Turner with the white officer was simply a racial pretext to keep Turner from enjoying the benefit of the department's seniority rule.[78]

█ Turner also claims that the department refused to promote him to the rank of captain in 1987 because of his race. The court again agrees. By 1987, the department had abandoned the seniority system in favor of certain review panels. The department says that it selected a white male over Turner because the white male was ranked higher by the department's review panel. The court is convinced, however, that the ranking was racially biased.

In 1983, the white male had been demoted from captain to the lowest rank because of an incident that involved beating inmates. There had also been numerous formal and informal complaints against the white male for arriving at work with alcohol on his breath, and the white male's abuse of alcohol was well-known among all officers in the department. Indeed, just two weeks before his promotion, the white male was accused of drinking with inmates. In contrast, Turner had a near-perfect disciplinary record at the time, and had much better educational qualifications than the white male. Turner was denied the promotion to captain in 1987 for one reason: his race.

█ Finally, Turner claims that, in 1987, the department refused to allow him to transfer with his rank from the corrections division to the enforcement division because of his race. The court agrees. Prior to 1987, all entry level officers were hired as "deputy sheriffs" with full arrest powers, and were assigned to either corrections or enforcement. However, a deputy transferring from the jail to the field was required generally to abandon any rank attained in corrections and to move to the field at the lowest rank of deputy.[79] In 1986, the department reorganized itself in preparation for moving into a new, larger jail. Under this new scheme, the corrections and enforcement divisions each had their own career tracks. Newly hired officers in corrections would be known as corrections officers, and newly hired officers in enforcement would continue to be known as deputy sheriffs. The new hires in each

---

**78.** McKitt says that he recommended the white male over Turner because the white male was faster than Turner in making decisions. McKitt did not, however, convey this reason to Sheriff Butler and his chief deputy before they made the decision to promote the white male. Sheriff Butler and his chief deputy only knew that McKitt preferred the white male. This mere preference did not justify deviating from the seniority rule.

Moreover, Turner contends that he was sometimes slow to make decisions because the racially discriminatory treatment of his fellow officers had made him fearful of making a wrong decision. Although the court finds some factual merit in this contention, the court does not base its conclusion regarding the 1983 promotion on it.

**79.** Turner contends that this rule which required that those in the jail abandon their rank in order to transfer to the field was adopted in 1977 to keep blacks with rank in the jail from transferring their rank to the field. The evidence does not support this contention. First, there were no blacks of rank in jail when the rule was adopted in 1977. Second, the department has applied the rule to at least four white officers who had to abandon their rank when they transferred from the jail to the field.

division received different training, and only those hired as deputy sheriffs in enforcement were given arrest powers. Furthermore, under this new scheme, both old and new officers in the jail who desired to work in enforcement had to submit new applications for that division.

There was, however, a temporary exception to this last requirement. The department adopted a transition rule which provided that for one year, from July 31, 1986, to July 31, 1987, officers in the jail would be allowed to "transfer laterally" to the enforcement division. This temporary rule was drafted by the county administrator who, in a meeting in March of 1987 with officers in jail, said that the rule meant that an officer could transfer to enforcement without losing his or her rank. In April of 1987, based on what he heard from the county administrator, Turner requested to transfer to the enforcement division as a lieutenant, his rank then. Chief Deputy Huggins responded, however, that Turner could transfer but not with his rank.

The department argues that its earlier practice prohibiting officers in the jail from transferring with rank to the field applied to the transition rule. The court finds the department's argument to be a pretext for intentional racial discrimination against Turner. The county administrator who drafted the rule understood and intended that it would allow transfers with rank. He told the jail officers this at the March 1987 meeting. Moreover, the transition rule uses the term "lateral transfer," and under the terminology of the rules and regulations of the City–County Personnel Board from which the term was taken, lateral transfer means a transfer with rank.

The department contends that its interpretation of the rule should nonetheless be accepted by the court for two reasons. First, Chief Deputy Huggins stated in a memorandum of April 9, 1987, that "when the County Commission allotted the rank positions in the jail they did request that the positions remain in the jail." [80] In other words, according to Huggins, positions in the corrections cannot be transferred to enforcement. Turner could have transferred, however, from the jail to the field at the same rank but without actually transferring his position from one division to another. In 1987, a white lieutenant in enforcement retired; Turner should have been transferred to this vacant position. Indeed, that transfers with rank to enforcement was intended is apparent from the department's admission that, under even their interpretation of the transition rule, Turner could have applied for a higher rank in enforcement if and when one became available; for example, according to the department, Turner could have applied for promotion to a vacant captain's position in enforcement. It is thus evident that the department's principal concern and condition for transfer with rank is that there be a vacant position in enforcement. Indeed, the conditions under which an officer may transfer under the county administrator's and Turner's interpretation of the transition rule—that an officer can transfer with rank from the corrections division to the enforcement division as long as there is an appropriate vacancy in enforcement and that an officer in corrections can seek promotion to a vacant position in enforcement—are logically related. In contrast, the two conditions under which transfer is available under the department's interpretation—that an officer in corrections may seek a promotion to a vacant position in enforcement and that an officer in corrections may transfer to only the lowest rank in corrections—bear no logical relationship.

Second, the department notes that a white sergeant who transferred from corrections to enforcement under the transition rule lost his rank. The white officer requested and received the transfer after Turner had made known to the department that he desired to transfer with rank. Turner was not treated the same as the white sergeant, but rather the department had to treat the white officer the same as Turner in order to hide its discriminatory purpose.

---

80. Scott's exhibit 76.

Finally, the court is convinced that it could not have been happenstance that each time Turner attempted to take advantage of a departmental rule which would have resulted in his substantial advancement, the department changed, or deviated from, the rule. In 1983, when Turner sought a promotion based on the rule of seniority, the department deviated from the rule so as to deny him its benefit. In 1987, when he sought a transfer based on the department's transition rule as it had been explained to him by its author, the department reinterpreted the rule so as to deny him its benefit. The departmental officials—in particular, Chief Deputy Huggins—responded as they did not out of some neutral, nondiscriminatory concern, but rather because they were dealing with Turner. The rules were being ignored and reinterpreted in order to discriminate against Turner because of his race.[81]

### iii.

■ The court turns next to the individual claims of Addie Berry and Cinda Brown. Addie Berry, who has been with the Sheriff's Department since 1975, claims that the department refused to assign her temporarily as deputy in charge of court security because she is black. The court agrees with Berry. In 1987, Lieutenant Troy Yates, the head of the court security unit in the field division, took a vacation for two weeks. Court security handles all security operations for the Montgomery County courts. At that time, the practice in the department was to appoint the unit's most senior officer next in line to serve in the absence of the unit's head. Chief Deputy Huggins refused to assign Berry, the most senior officer, and instead brought in a white male from outside the unit to serve in Yates's absence. Huggins says that he brought in an outside officer because the year before, when Yates took his annual

vacation, there had been a dispute within the security unit as to who should serve as temporary supervisor; those within the unit were apparently unaware of the department's seniority rule. The court finds Huggins's reasons to be pretextual. The simple solution to the problem was to explain the seniority rule to those within the unit and to apply that rule. Moreover, the white male officer brought in had no recent experience in court security, and, in particular, no experience with regard to the changed duties and procedures of the unit in the new jail. The court is convinced that Huggins brought in the white male so as to avoid appointing Berry because she is black.[82]

■ Cinda Brown, who has been with the department since 1986, claims that the department discriminated against her because it failed to accommodate her when she was pregnant to the extent it accommodated white officers who were temporarily physically disabled. The court agrees. Brown requested to wear civilian maternity pants because the department had no uniforms that would fit her. She also asked to stop wearing a gun belt because it was too tight around her waist and was causing irritation. Finally, when she began, of and on, to have some "bleeding" problems, she asked for light duty in a control booth. Although she ultimately received all these accommodations, she did not receive them until late in her pregnancy, after much effort and after being threatened by Yates with discipline because she was not wearing her gun belt. Yates's attitude toward Brown was, in her words, that her "pregnancy was not his concern." [83] In contrast, several white officers were readily allowed to wear civilian clothes and work without their belts for health reasons, and sometimes for no reasons at all; whites were

---

**81.** *See Sims v. Montgomery County Commission,* 544 F.Supp. 420, 426 (M.D.Ala.1982) ("uneven application of criteria is strong evidence that the criteria were never in fact employed in the selection process and were used by the employer as merely a pretext for discrimination").

**82.** Yates has suggested in his testimony that Huggins brought in someone from the outside

the unit because Berry had threatened to sue the department. *See* Transcript at 1803–05. This reason is also illegal because it indicated that Berry was denied the temporary position for an impermissible retaliatory reason.

**83.** Transcript at 2064.

also readily given light duty for health reasons. The court agrees that Brown has been a victim of racial discrimination.

■ The court also agrees with Berry that Yates has racially harassed her. On two occasions since 1987, Yates referred to Berry's race and color in a derogatory manner. In one instance, when Berry attempted to explain to Yates why she had taken a day off, Yates told her to get her "god damn black ass out" of his office.[84] In another instance, when Berry came to Yates's office to inquire as to why she had not received a telephone message about her ill sister who was in the hospital, Yates said to her as she was about to leave, "Now, you set your black ass in that chair until I tell you to leave."[85]

Berry, however, had to endure more than just Yates's direct racial slurs towards her. Racial slurs were very common in the department. Berry recently heard Sheriff Butler himself say "Let me see what this nigger woman want."[86] This was not, however, the first time she had heard Butler call blacks "niggers." Ten years earlier, she heard him refer to a black man as an "ole nigger man."[87] Fellow officers also used the word "nigger" in Berry's presence. Recently, she also heard Officer B.E. Knox refer to a black female as a "nigger female."[88] She also heard Yates refer to black people as "animals."[89] With regard to an incident in which members of a black family attacked two white officers who had broken into the home where they had gathered for a funeral, Yates said that "All black people are nothing but animals."[90]

The racial harassment and slurs in the Sheriff's Department understandably affected Berry deeply. Because of them, she felt she did not have "a chance to advance."[91] Moreover, Berry said that Yates "dehumanized me so bad I went in the bathroom and I just broke down and cried" on several occasions.[92] Because she was "scared to death of Lt. Yates," Berry "stayed nervous and ... would end up going home a lot of evenings just taking aspirins."[93] The court can only conclude that, for Berry, the racial harassment and slurs were so grave and severe, and frequent, as to alter the condition of her employment and to create an abusive working environment for her. The court further finds, as it explains later, that the department is liable under almost all of the various theories of liability previously discussed.

■ Berry and Brown have also been victims of retaliation. Yates refused to allow Berry and Brown to use the bathroom in his office. Yates says he did this because his bathroom did not have a vent fan or window and he did not want other officers "to go inside the bathroom and have bowel movements."[94] The court finds Yates's reason to be pretextual. Because all officers, except Berry and Brown, could use his bathroom freely, and furthermore, because Yates took this action shortly after Berry and Brown came under his command and he had heard they were contemplating litigation against the department, the court is convinced that Yates took this action against the two women to retaliate against them.[95] Moreover, Yates

84. *Id.* at 1960.

85. *Id.* at 1962. The department questions whether Yates used the term "black" when he spoke to her in the second instance. The court finds Berry's testimony credible. In light of Yates overall discriminatory attitude toward Berry and other blacks in the security unit, the court believes that it is more likely true that Yates said "black."

86. *Id.* at 1952.

87. *Id.* at 1951.

88. *Id.* at 1950.

89. *Id.* at 1953.

90. *Id.* at 1954.

91. *Id.* at 1977.

92. *Id.*

93. *Id.* at 1978.

94. *Id.* at 1698.

95. For example, Yates testified as follows:

I had been told Addie Berry intended to file a race discrimination suit against the sheriff's

continued to retaliate against Berry and Brown by abusing them verbally about the bathroom in front of other officers. When Sheriff Butler, in response to an administrative charge of discrimination Berry and Brown had filed with the EEOC, told Yates he had to allow the two black women to use his bathroom, Yates responded to Berry and Brown's complaint by saying in front of all officers in the unit, "you could stoop down right there and shit on the floor." [96] Yates also retaliated against Berry and Brown, following the filing of their EEOC charges, by keeping detailed files on them. Yates says that he kept files on them just as he kept files on all those in the security unit. Yates's reason is, however, not credible. First, the court is convinced from the evidence that Yates fabricated the files on the white officers only after it came to light in this litigation that he had special files on the black officers. Second, it is apparent from the files that Yates did not treat Berry and Brown the same as the other officers in the security unit. For example, Yates carefully documented absenteeism by Berry and Brown, but did not document the clearly excessive absenteeism of a white male officer.

Yates also says he kept detailed documentation on Brown because he was concerned about her health during her pregnancy. Yates's reason is not supported by the credible evidence. First, Brown's file reflects that Yates sole purpose was to gather information so he could get rid of her. Second, the court agrees with Brown that Yates was, at best, indifferent to her pregnancy as reflected in his statement to her that her "pregnancy was not his concern," [97] and that he was, at worst, more biased against her because she was pregnant.

Yates also retaliated against Berry and Brown in two other ways following the filing of their charges with the EEOC. First, he requested that they always stay until 5:00 p.m. each work day, while allowing the other officers to leave early, and go and come, as they pleased. Second, he required that Berry and Brown, but not the other officers, walk the halls during their "down time," that is, when they did not have a courtroom to watch or serve.

Yates also retaliated against Berry and Brown separately. For example, when Berry would pass by Yates's office with an extra large number of inmates, he would always find another officer to assist her. After she filed her EEOC charge, he no longer offered such help. Yates did not resume giving her such help until after she complained about his conduct during pretrial proceedings in this litigation. Yates also displayed his dislike for Brown on one occasion by deliberately making an "offside step to step on her foot" as he was entering a control booth and by "pushing" her when he left. [98]

### 4. Class Claims of Racial Harassment

 The Scott class also claims that racial harassment in the Sheriff's Department has in general created a hostile working environment for black officers. Applying the principles of law discussed earlier with regard to sexually hostile environment harassment, the court concludes that racial harassment in the Montgomery County Sheriff's Department has permeated all ranks, from the lowest level corrections officers and deputy sheriffs to the sheriff himself, and is so pervasive and severe as to render the working conditions in the department psychologically intolerable for black officers.

#### i.

The court has already described how Addie Berry was recently told by a white supervisor on one occasion to get her "god damn black ass out" of his office,[99] and on another occasion to "set your black ass in

---

department, and then when she came in my unit, well, I was always particular and careful.
*Id.* at 1701–02.

**96.** *Id.* at 1979, 1700–01.

**97.** *Id.* at 2064.

**98.** *Id.* at 1975–76.

**99.** *Id.* at 1960.

that chair until I tell you to leave," [100] and how she overheard this same supervisor comment that "All black people are nothing but animals." [101] The court has also already described how Berry recently heard Sheriff Butler himself say "Let me see what this nigger woman want." [102] These racial slurs, the court indicated, left Berry so "dehumanized" that she felt she had no "chance to advance." [103] Berry was not the only one who suffered such intolerable indignities. The evidence before the court reflected that racial harassment, like sexual harassment, is simply an accepted form of daily social interaction in the Montgomery County Sheriff's Department.

First, when the department began to hire black officers in the late 60's and early 70's, the term "nigger," in the words of the first black officer, was "common," "it was used quite frequently by most of them." [104] The terms "black nigger," "red nigger," and "apes" were also common. [105] Moreover, one of those who regularly referred to black persons as "niggers" was Sheriff Butler himself. The atmosphere in the department was one in which black officers were made to feel inferior and unwelcome. Although the use of term "nigger" in the department has declined over the years, it is still used often enough to perpetuate this atmosphere. A white officer candidly testified that, from her interaction with other white officers, the term "nigger" is still accepted within the department. In response to direct questions from the court, this officer testified:

Q. Would you say that just the use of the term nigger is not something that is frowned upon within the department, that it's used frequently?

A. No, sir, I don't think it's frowned upon.

Q. Do you think it's prohibited at all? Do you think the department has a policy to prohibit its use?

A. No, sir, not that I know of. [106]

Butler still uses the term "nigger" and even tells racial jokes using it. [107] Moreover, while the trial of this cause was in progress, Butler's third-in-command, Assistant Chief Deputy W.J. Walker, in his comments to a fellow officer referred to blacks as "them damn niggers." [108] Similarly, while this trial was on-going, Officer William Sanders, in the words of a fellow officer, casually commented one evening that "he was trying to get over his cold from these niggers ... and five seconds later, added inmates." [109] Other examples of recent racial comments by white officers include the following:

(1) Officer Troy Yates, when he was assigned to work under the supervision of a black officer, said he would not "work for a nigger." [110]

(2) Officer Billy Mason said that a black officer could not accompany him into a "predominantly white neighborhood" because "they don't like no niggers in that neighborhood." [111]

(3) Officer Robert Widner referred to his fellow black officers as "you darkies." [112]

(4) Officer John Moorer referred to blacks as "niggers" over the county radio. [113]

(5) Officer Travis Parker, in commenting on the term "nigger," said "I have a problem when I get angry with some

---

100. *Id.*

101. *Id.* at 1954.

102. *Id.* at 1952.

103. *Id.* at 1977.

104. *Id.* at 1524.

105. *Id.* at 1494–96, 1500.

106. *Id.* at 1623.

107. *Id.* at 1619, 2633–37.

108. *Id.* at 2242.

109. Defendants' exhibit 117.

110. Transcript at 2238.

111. *Id.* at 2581.

112. *Id.* at 2420–21, 2510–11.

113. Scott's exhibit 38.

people, namely, black folks, it slip out."[114]

(6) Officer Bobby Milstead has referred to blacks as "niggers" and "coons."[115]

(7) Officer N.W. Ward has referred to blacks as "niggers."[116]

(8) Officer Noble has referred to blacks as "niggers."[117]

The department argues that most of these references were to inmates or private citizens and not fellow officers, and that some were made between white officers only. This argument not only misses the point, it reflects a total insensitivity to just how demeaning and insulting the term "nigger" is to black officers when merely used in their presence, or when black officers hear second-hand that a white officer whom they know and should respect has used the term on the job. Indeed, with this argument, the department fails to appreciate that racial harassment in the department can never be adequately redressed until all officers, in both their private and public comments at work, come to denounce the term.

Second, racial harassment can consist of more than racial slurs. As with sexual harassment, conduct which ridicules blacks or treats them as inferiors can constitute prohibited racial harassment. The department's policy of generally assigning officers to patrol cars and to neighborhoods according to the officers' race and its policy of especially avoiding the assignment of white female officers and black male officers to share patrol cars are so overtly and clearly demeaning to blacks that they can only be characterized as racial harassment.

That departmental officials did not themselves recognize these two policies to be such again reflects their total insensitivity to racial harassment and discrimination in the department; it also reflects their total indifference to the feelings of the black officers in the department. Moreover, the evidence reflects that black supervisors were racially harassed by white subordinates who refused to give them the same respect they gave white supervisors and call them by their titles of rank and position, and who sometimes even called the black supervisors by their first names. These black supervisors were also harassed by white subordinates who would bypass them and go directly to Chief Deputy Huggins with their concerns and complaints, and by Huggins who would in turn bypass them in responding.[118] Without question, the above two policies, the lack of respect for black supervisors by white officers, and the racial slurs described above all spring from the same conscious discriminatory bias: that white people are superior and black people are inferior.

ii.

■ The court further concludes that the Montgomery County Sheriff's Department is liable for the racially offensive and hostile working environment its white officers have created for its African–American officers. First, the Sheriff's Department is *directly* liable for this harassment because the perpetrators of the racial harassment were actually acting within the scope of their authority under § 219(1) of the Restatement when they engaged in the illegal conduct. The evidence convinces the court

**114.** Transcript at 2243.

**115.** *Id.* at 1620.

**116.** *Id.* at 1622.

**117.** *Id.* at 1623.

**118.** In 1987, the court security unit was moved from the corrections division to the enforcement division. The reason given for this move was that, because officers in the unit were responsible for carrying jail inmates to and from court, they had to have arrest powers. Under the new organization for the department, all new officers hired for the corrections division would not have arrest powers but those for enforcement would. The head of the court security unit at that time was Troy Yates. Yates had made known that he would not "work for a nigger," referring to Jail Administrator Willie McKitt, who is black. The court is firmly convinced that an additional, if not primary, motivating factor behind Yates's efforts to have the unit moved from corrections was his desire not to work for a black person, any black person. The court also believes that, because Yates was not quiet about his feelings toward black people, departmental officials were fully aware of this fact.

that the department has a policy of discouraging blacks from seeking advancement—in particular, in the enforcement division—and that the racial harassment was simply a way of furthering that policy. This policy is based on a belief by departmental officials, as explained earlier, that black officers are inferior to white officers. The department is also *indirectly* liable under the theory of *respondeat superior* for the racial harassment by both the supervisors and co-employees of the victims of the harassment. Not only was the racial harassment so open and pervasive that all those in supervisory authority should have know about it, the key supervisors in fact did know about the harassment because they were themselves perpetrators.

■ As with the Johnson class's claims of sexual harassment, the Sheriff's Department offers the defense that it should not be held liable because the victims of racial harassment failed to take advantage of available avenues for relief, both within and outside the department. The department contends again that race discrimination and, in particular, racial harassment are prohibited in the department by provisions in an Employee Handbook published by the Montgomery County Commission [119] and provisions in the Rules and Regulations of the Montgomery City–County Personnel Board.[120] The department further contends that any black officer who felt that a white officer had violated these provisions could have sought relief from four sources: by pursuing a complaint through the "chain of command" within the department; by invoking the procedures of the department's disciplinary review board;[121] by seeking help from the Montgomery County Commission Administrator;[122] and by filing a complaint with the Montgomery City–County Personnel Board.[123]

The court responds to this defense in the same way that it responded to it when it was raised in the Johnson litigation. The Supreme Court and the Eleventh Circuit have suggested that an employer may be insulated from a claim of hostile environment harassment if the employer has an explicit policy against the harassment and if it has effective grievance procedures calculated to encourage victims of harassment to come forward. Here the evidence reflects that the Sheriff's Department does not condemn racial harassment but rather condones and encourages it. Counsel for the department notes that the County Employee Handbook and the Rules and Regulations of the City–County Personnel Board together prohibit racial harassment. The evidence reflects, however, that the Sheriff's Department does not view these prohibitory provisions as applying to it. First, it is apparent from the conduct of the department's top supervisors—in particular, Sheriff Butler—that they do not consider racial harassment as illegal and prohibited in the department. As one white officer said, the term "nigger" is not "frowned upon" in the department.[124] Second, as the court stated earlier, the department has not made known to its employees that these provisions apply to them, and thus most of its employees are unaware of the provisions. Finally, as the court stated earlier, it is open to serious question whether these prohibitory provisions even apply to the Sheriff's Department. The testimony at trial indicated that, because the sheriff of the county is a constitutionally elected official, his department is somewhat autonomous and, thus, the authority of the County Commission and the City–County Personnel Board probably does not extend over grievance matters in the Sheriff's Department.

---

**119.** *See* note 46, *supra*.

**120.** The personnel board's rules and regulations provide, in part, as follows:
> Discrimination against any person in recruitment, examination, appointment, training, promotion, retention, discipline, or any other aspect of personnel administration ... because of race ... is prohibited.

Defendants' exhibit 3 at 21.

**121.** *See* note 48, *supra*.

**122.** *See* note 49, *supra*.

**123.** *See* note 50, *supra*.

**124.** Transcript at 1623.

Furthermore, the department clearly does not have procedures which are, in the words of the Supreme Court, "calculated to *encourage* victims of harassment to come forward." *Meritor Savings Bank*, 477 U.S. at 73, 106 S.Ct. at 2408 (emphasis added). The "chain-of-command" procedures and the "disciplinary board review" process are not open to claims of racial harassment. To pursue such procedures, a victim of harassment would have to pursue relief from the very people who are primarily guilty of racial harassment.[125] Moreover, it is apparent that most white officers in the Montgomery County Sheriff's Department—in particular, Sheriff Butler—neither know what conduct constitutes "racial harassment" in violation of the law, nor do they perceive conduct which violates the law as serious infractions. For example, Sheriff Butler strongly implied in testimony before the court that the term "nigger" was a friendly term and that the problem posed by its use was more a matter of modern-day decorum than a serious issue of the ability of African–Americans to function in the workplace. Butler testified as follows:

"Q. Do you think, Sheriff, that it is reasonable for a black deputy who hears you using the word "nigger" to believe that you don't think as much of black people as you think of white people?

A. I imagine he'd get that opinion. But if I've used it, its not to insult anybody. It's just use of habit, which I've tried to break myself of through the years; and I think I've done a pretty good job, and *specially in radio conversation....*— that when we using the radio I try to use proper language as I know how, and use no remarks that would be disagreeable to any one listening."[126]

Butler clearly does not realize that the use of the term "nigger" in his department is a much more serious problem than "proper language" in "radio conversation"; he still does not realize that the extensive use of the term, as is the case in his department, is against the law and thus requires strong remedial measures, including punishment sufficiently severe to let those in the department know that racial harassment will no longer be tolerated.

The Montgomery County Administrator also does not offer an adequate means for redress of complaints of racial harassment. As the court stated earlier, the administrator's authority is limited to mediation; he does not have authority to resolve complaints of discrimination. In any event, as with complaints of sexual discrimination, the department has never made known to its employees that the administrator is available to hear complaints of racial discrimination, and most employees are unaware of him as an avenue of help. Finally, as stated earlier, the City–County Personnel Board is not a means of review. Employees of the Sheriff's Department have never viewed the personnel board as a place to resolve grievances; and, moreover, it appears that, while the board has some authority over hiring and firing, it probably has no authority over grievance matters within the Sheriff's Department and thus cannot resolve grievances raised by its employees.

The department observes that, on two or three occasions, Sheriff Butler has put out memoranda informing officers that they should refer to black officers as "blacks." These memoranda had no effect on harassment in the department, nor were they intended to. The memoranda were merely an effort by Butler to pretend he was doing something when he was not; they were Butler's way of avoiding taking disciplinary action against the offending white officers.

The department also notes that when Officer William Sanders used the term "nigger," he was required to apologize to the other officers who heard it. As discussed previously, Sanders's offensive comment was that "he was trying to get over

---

125. Cf. *Solomon v. Royal Oak Township*, 842 F.2d 862, 866 (6th Cir.1988) (noting the futility of taking a complaint through the chain-of-command when the employee's supervisor is the object of that complaint).

126. Scott's exhibit E at 58–59, to his post-trial brief.

his cold from these niggers ... and five seconds later, added inmates." [127] The court gives the department little to no credit for requiring that Sanders apologize. First, the department took this action during the trial of this cause. The court is convinced that, absent the trial, nothing would have been required of Sanders. Second, Sanders's comment should have resulted in more that a mere apology; he should have been punished. The department says, however, that the officers who heard the comment did not want to take any action beyond the apology. The department overlooks, or simply has yet to appreciate, that Sanders was breaking the law in his harassment of black officers. The department itself should have sought to punish Sanders irrespective of the desires of the other officers who heard the offensive comment. Nothing short of punishment would have sent out the message to all officers, black and white, that the department intended to rid itself of racial harassment immediately and completely.

In conclusion, the court finds that racial harassment in the Montgomery County Sheriff's Department—in particular, the use of racial slurs such as "nigger"—is so severe and pervasive as to alter the conditions of employment for black officers and render the working environment for them abusive. The court further finds that the department is liable for this environment. The term "nigger" is so severely dehumanizing that its use in the workplace on just a few occasions can render the workplace psychologically intolerable. Moreover, the detrimental effect of the term is multiple when an employer who has knowledge of the use of the term takes no action or takes only weak action, because the employer through its lack of an adequate response has implicitly condoned and encouraged the use of the term and thereby rendered a further blow to the humanity of its black employees. In the Montgomery County Sheriff's Department, the use of the term "nigger" has been frequent and, because

the department with this knowledge has done little to nothing, the effect has been devastating.[128]

### 5. Class Claims of Disparate Treatment

The Scott class claims that the officials of the Montgomery County Sheriff's Department have engaged in a "pattern and practice" of intentional discrimination on the basis of race. To prove a system-wide pattern or practice of discrimination, an employee must prove "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts," but rather must "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure— the regular rather than the unusual practice." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977). An employee may do this by anecdotal evidence showing a pattern and practice of individual instances of discrimination. *Perryman v. Johnson Products Co., Inc.*, 698 F.2d 1138, 1143 (11th Cir.1983). The evidence here firmly establishes that officials of the Sheriff's Department have engaged in a pattern and practice of discriminating against black officers in four major areas of personnel action: discipline, promotions, transfers, and job assignments. Indeed, the evidence reflects that racial bias is widespread and deep-rooted in the Sheriff's Department, and has routinely infected the decisions of many administrators and supervisors, in particular, the sheriff and high-level commanders in the enforcement division.

i.

The court has already described numerous instances of discrimination in the department's promotion, transfer, and job assignment processes. For example, the court has described how, from 1968 until the initiation of this litigation in 1988, the department has in general assigned black officers to serve as car partners with only

---

**127.** Defendants' exhibit 117.

**128.** Indeed, in these modern times, because African–Americans are no longer taught that they

are second-class citizens but rather that they stand equal with people of all races, the term "nigger" is often a "fighting word."

black officers, and white officers to serve as car partners with white officers; the department has also in general assigned black officers to work in the predominantly black west side of the City of Montgomery and white officers to the predominantly white east side. The court also described how the department particularly frowned upon black male officers riding with white female officers. This evidence alone is sufficient to support a conclusion that the departmental officials are driven by racial bias.

The court also described how W.T. Scott was denied a transfer to the investigation unit for racially retaliatory reasons; how Melvin Turner was denied a promotion to captain in 1983 and in 1987 because of his race; how Turner was also denied a transfer to the more prestigious enforcement division in 1987 because of his race; how Addie Berry was denied temporary duty as head of the court security unit in 1987 because of her race; and how the department refused to accommodate Cinda Brown's pregnancy because of her race.

The evidence also reflects that, in 1988, the department discriminated against Stoney Davis because he is black. Of the five persons from whom the department was to choose a new corrections officer, Davis and two other blacks were the top three. The department passed over their names in order to hire a white officer. The department has offered no reason for its decision to select the white officer over Davis. In light of the history of discrimination in the department, the court is convinced that Davis has been a victim of racial discrimination.[129]

Moreover, the court is convinced that all of the above instances, when set against the background of the department's widespread and severe racial harassment of its black officers, reflect a clear pattern and practice of discrimination in the department with regard to promotions, transfers, and job assignments.

ii.

The evidence also demonstrated that black officers were regularly sent before the disciplinary review board, and were harshly punished, for infractions that were handled informally when committed by white deputies.[130] For example, as discussed earlier, W.T. Scott was disciplined for commenting to another deputy that a juror had a criminal record. In contrast, when a white officer was charged with discussing a pending case with a juror and talking to a defendant about his guilt or innocence, Huggins granted the white officer's request for a transfer out of court security and did not process the complaint through a disciplinary review board. Another example is when Troy Yates sent Cinda Brown before a disciplinary review board for mistakenly carrying a gun into the jail while, earlier, he did not file a complaint against a white male who had accidentally discharged his personal gun in the sheriff's office.

The Sheriff's Department also has allowed its internal disciplinary process to be perverted by a procedure which has come to be known in this litigation as "mutual cancellation." The evidence revealed several instances where after a black officer had filed a complaint against a white officer and the investigation revealed that the complaint had some merit, the white officer was then permitted to file counter-charges against the black officer. The two complaints were then heard by the board at the same time. For example, Yates did not charge Brown with improperly carrying a gun into the jail until after she filed a claim

---

**129.** The court has reserved treating the Davis incident as a separate and independent claim because of the department's argument that it did not understand that the Scott class was pursuing such a claim for him. If Davis wants to pursue his own separate claim, he must file it with the court within 35 days.

**130.** *See* Scott's exhibits 12 & 13. The court notes that these charts prepared by class counsel include traffic accidents involving deputies. Such accidents are processed through the Montgomery County accident review board, which is separate from the Sheriff's Department, and, therefore, the court has not considered any of these accidents in reaching the conclusion that the Sheriff's Department's disciplinary system is operated in a racially discriminatory manner.

against him for purposefully stepping on her foot. After the hearing, the board stated that Brown and Yates should not work together, but recommended no disciplinary action. Similarly, as this court has already described, when two female officers accused Robert Singleton of coming to the scene of an investigation drunk and with sexually harassing them, the disciplinary review board recommended that all three officers be counselled about drinking, sexual harassment and showing disrespect to a superior officer. These two women are also black. The court believes that they received this unfair treatment not only because they are female, as the court has found previously, but also because they are black.[131]

The most egregious example of this "mutual cancellation" policy occurred to Melvin Turner. In May 1985, Turner submitted a written charge of subordination against a non-ranking white officer, after counselling him numerous times for not following orders. A review board was convened and held a hearing at which the white officer testified. Turner, the complaining supervisor, was not called to testify and was not even informed of the impending hearing. Turner first learned that a hearing had been held when he was called in for counselling based on the board's finding that he was guilty of inadequate knowledge of jail procedures and inadequate communication with his officers. The board recommended that the white officer be counselled for "insubordination" and that Turner be counselled as well. Despite the fact that there is no evidence that any formal charge was filed against Turner in connection with this incident, the board's report recommending counseling for both Turner and the white officer was made part of Turner's permanent personnel file.

A critical factor in the court's conclusion that the department has routinely discriminated in disciplining its officers is that the disciplinary process is, for the most part, unwritten and subjective. Discipline is left to the caprice of each individual supervisor. Supervisors are not instructed as to what constitutes misbehavior, what forms of misbehavior should result in disciplinary actions, when misbehavior should be reported to higher ranking officers, or what type of punishment is appropriate for various forms of misconduct. Moreover, the "disciplinary review board" process is equally as flawed. The department has never established any guidelines setting forth the appropriate disciplinary measure for a given set of circumstances.

To be sure, there is nothing in Title VII, the 1973 consent decree, or the fourteenth amendment that requires that employment procedures, including disciplinary ones, be in writing and based on objective criteria. However, as is apparent from the circumstances and conditions in the Montgomery County Sheriff's Department described so far by the court, most of the white officers in the department's upper ranks harbor a strong racial bias against black people. The unwritten quality of the disciplinary process has simply given this bias much area in which to act. As this court has observed, "unwritten policies, as opposed to written policies, can be easily turned into tools of discrimination." *Dunning v. National Industries*, 720 F.Supp. 924, 931 (M.D.Ala.1989). Similarly, the subjective quality of the process has made it easier for the department to discriminate. The Eleventh Circuit has noted this about similar procedures, in language applicable to the setting at hand:

> This circuit has frequently noted the problems associated with this type of worker assessment and noted that sub-

131. Black female officers employed by the Sheriff's Department are in an especially precarious position because they are subjected to both sexual and racial harassment, as described above with regard to the two black women who brought charges against Singleton. Moreover, they are also subjected to additional discrimination because of their dual status which neither the white female officers nor the black male officers must bear. As the former Fifth Circuit has stated, "discrimination against black females can exist even in the absence of discrimination against black men or white women." *Jefferies v. Harris County Community Action Association*, 615 F.2d 1025, 1032 (5th Cir.1980).

jective evaluations involving white supervisors provide a ready mechanism for racial discrimination. This is because the supervisor is left free to indulge a preference, if he has one, for one race of workers over another. In addition, subjective and vague criteria may be insufficient reasons given by an employer for its failure to rehire because such criteria do not allow a reasonable opportunity for rebuttal. The employee is left without any objective criteria to point to in order to show competence.

*Miles v. M.N.C. Corp.*, 750 F.2d 867, 871 (11th Cir.1985) (citations and footnotes omitted).[132] In short, because, as has been shown, high ranking officers in the department harbor a strong racial bias against blacks and because the disciplinary process has provided a unrestricted field in which that bias is left to manifest itself freely, the court is convinced that race has probably played some role, not only in the few anecdotal incidents of discrimination shown by the Scott class, but in most, if not all, of the department's disciplinary decisions.[133]

## C. *Claims of Disparate Impact*

The Scott class also has a number of disparate impact claims against the Montgomery County Sheriff's Department. A "disparate impact" claim differs from a "disparate treatment" claim in that, with the latter, an employee must prove intentional discrimination, *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), but with the former, the employee challenges "practices that are fair in form but discriminatory in operation," *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 645, 109 S.Ct. 2115, 2119, 104 L.Ed.2d 733 (1989) (*quoting Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)); the employee need not prove intentional discrimination. *Wards Cove*, 490 U.S. at 645–46, 109 S.Ct. at 2119.

 In assessing a disparate impact claim, a court should use a three-step process similar to the one used in assessing a disparate treatment claim. First, the employee must identify the specific employment practice challenged and, further, must show that the challenged practice falls significantly more harshly on one group than another, that is, that the practice under attack has created "adverse impact." *Wards Cove*, 490 U.S. at 655–57, 109 S.Ct. at 2124. If this showing is made, the burden then shifts to the employer to produce evidence of employment justification for the employment practice. The employer's burden is one of production not persuasion, for the burden of persuasion always remains with the employee. Finally, if the employer satisfied its burden, the employee may prevail only if she shows that the employer's justification for the practice has no basis in fact or that another practice, without a similarly undesirable adverse effect, would also serve the employer's legitimate employment interests. *Id.*, at 659–61, 109 S.Ct. at 2126. Adverse impact may be established by statistical evidence alone so long as the statistical pool—or sample, if appropriate—is logically related to the employment decision at issue and the method of comparison applied to that pool or sample is meaningful. *See Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982); *See also Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Maddox v. Claytor*, 764 F.2d 1539, 1553–56 (11th Cir. 1985); *Eastland v. Tennessee Valley Authority*, 704 F.2d 613, 619 (11th Cir.1983), *cert. denied*, 465 U.S. 1066, 104 S.Ct. 1415,

---

**132.** *See also Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 108 S.Ct. 2777, 2797, 101 L.Ed.2d 827 (1988) (Blackmun, J., joined by Brennan and Marshall, JJ., concurring in part and concurring in the judgment) (cautioning, in a disparate impact context, against "[a]llowing an employer to escape liability [under Title VII] simply by articulating vague, inoffensive-sounding subjective criteria").

**133.** These biased officers were in no manner hindered by the disciplinary board review process. The evidence reflected that subordinate officers participating on disciplinary boards

79 L.Ed.2d 741 (1984).[134]

■ In her brief, counsel for the Scott class charges that virtually all of the decisions of the Sheriff's Department over the last six years regarding promotions, transfers, disciplinaries, and training are invalid under Title VII's disparate impact analysis. Class counsel does nothing more, however, than make conclusory allegations. She offered no expert testimony regarding how the court should determine whether there has been adverse impact; there is no expert testimony whatsoever from the Scott class as to what comparisons the court should draw and as to why these particular comparisons are job related and are meaningful statistically.[135] *See, e.g., Richardson v. Lamar County Board of Education,* 729 F.Supp. 806, 815 (M.D.Ala.) (adopting particular "method of comparison" only after discussing the merits and demerits of other methods of comparison). Class counsel has apparently overlooked the Supreme Court's critical instruction in *Wards Cove* that "a Title VII plaintiff does not make out a case of disparate impact simply by showing that, 'at the bottom line,' there is racial imbalance in the workforce." 490 U.S. at 657, 109 S.Ct. at 2124. Moreover, many of the numbers invoked in this litigation are small. Class counsel has

not responded at all to the department's contention that these numbers are too small for statistical analysis. *See* Question 21 of the Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines, 44 Fed.Reg. 11996 (March 2, 1979) (suggesting that the "four-fifths rule" by itself is inadequate for measuring adverse impact when the sample size is too small to be statistically significant).[136] The court declines at this time to reach the Scott class's disparate impact claims without a more detailed statistical and legal analysis from the class. The court lacks the expertise to engage in such analysis by itself.

### D. *Relief*

■ Because the Scott class has prevailed in part, it is entitled to appropriate relief. First, the class is entitled to a permanent injunction prohibiting the Sheriff's Department from assigning its officers to patrol cars and to neighborhoods based on the officers' race. Second, the department must take the following action with regard to W.T. Scott, Melvin Turner, Addie Berry, and Cinda Brown. With regard to Scott, the department must remove completely from Scott's personnel record the disciplinary in which Scott was charged with com-

were coerced or pressured into recommending what their superiors wanted.

**134.** In *Richardson v. Lamar County Board of Education,* 729 F.Supp. 806, 816 (M.D.Ala.1989), this court discussed some of the various formulas that may be used to measure the degree of impact in a case. The court mentioned 29 C.F.R. § 1607.4D (1988) (EEOC generally regards a selection rate which is less than 4/5, or 80%, of the rate for the group with the highest rate as an indication of significant adverse impact); *Hazelwood School District v. United States,* 433 U.S. 299, 308–311 & nn. 14 & 17, 97 S.Ct. 2736, 2742–43 & nn. 14 & 17, 53 L.Ed.2d 768 (1977) (if the difference between the expected value and the observed number is greater than two or three standard deviations, then adverse impact has been shown); and Shoben, *Differential Pass–Fail Rates in Employment Testing: Statistical Proof Under Title VII,* 91 Harv.L. Rev. 793, 797–800 (1981) (in cases involving challenges to employment tests, courts should use the "test for difference between independent proportions.")

**135.** For example, at one point in her brief, class counsel says with regard to discipline within the

department that "Disparate impact and disparate treatment analysis are also appropriate"; class counsel does not, however, offer any suggestion or proof as to how the court should apply disparate impact analysis to all the disciplinary actions in the department.

**136.** At the end of the trial, the court suggested to counsel for the Scott class that there may be methods of determining whether there is adverse impact even with small numbers. *See* Shoben, *Differential Pass–Fail Rates in Employment Testing: Statistical Proof under Title VII,* 91 Harv.L.Rev. 793, 812–13 (1981) (suggesting the use of the "Fisher exact test" when the sample is small); Question 21 of the Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines, 44 Fed.Reg. 11996 (March 2, 1979) (suggesting that a finding of adverse impact based on a small sample may be warranted where there is a pattern of a lower selection rate). Class counsel did not follow up on this suggestion from the court.

menting to another officer during jury selection that he believed a juror had a criminal record. The department must also offer to Scott a transfer to the investigation unit, retroactive to the point in time when he requested the transfer and with such backpay and other employment benefits he would have received had he been transferred at the time he requested a transfer. With regard to Turner, the department must offer him a promotion to captain in the corrections division, retroactive to the point in time in 1983 that the position was given to someone else and with such backpay and other employment benefits Turner would have received had he been promoted in 1983. The department must also allow Turner to transfer with rank to the enforcement division, retroactive to the point in time after the transition rule went into effect when the first position became available in enforcement at Turner's rank. Turner's transfer rank will be that of a captain if he accepts the department's offer of a promotion to captain; his rank will be that of a lieutenant otherwise. With regard to Berry and Brown, the department will be enjoined from discriminating against them because of their race and from retaliating against them because of their participation in this litigation.

■ Third, the Scott class is entitled to a permanent injunction prohibiting the department and all its officers, present and future, from engaging in racial harassment of its officers. The court agrees, however, with the Scott class that a prohibitory injunction is inadequate to address the racial harassment in the department. The department must also be required to take affirmative steps to rid the department of its current racially hostile atmosphere. The Scott class, as did the Johnson class, has suggested a number of extensive measures to do this. The court again states, however, that the Sheriff's Department should first have an opportunity to fashion such measures and propose them to the court. As the court stated previously, the primary responsibility for complying with

the law regarding employment discrimination lies with employers. The court will, therefore, give the department two months to submit to the court a temporary plan and a year to submit a permanent plan, each designed to address racial harassment in the department. The temporary plan must include, at a minimum, the following: a prohibition of all forms of racial harassment in the department; effective grievance procedures calculated to encourage victims of harassment to come forward with their complaints; and a program to educate all officers in the department about the law and their obligations under the law regarding racial discrimination, including, in particular, racial harassment. The grievance procedures in the temporary plan must allow alleged victims of harassment to have their complaints heard by persons who are not in any way biased against black persons and who have not themselves engaged in racial harassment. These procedures must also not be in any manner subject to the control or influence of those who are biased against black persons, including those who have themselves engaged in racial harassment.

The Sheriff's Department must also change its procedures with regard to promotions, discipline, transfers, and job assignments. The court understands that the department is now in the process of fashioning new procedures.[137] The court will give the department six months to submit these new procedures to the court for approval.

Finally, the Scott class is entitled to recover reasonable attorney's fees and expenses. 42 U.S.C.A. § 2000e–5(k). The court will give the parties an opportunity to agree to such fees and expenses.

## III. THE MONTGOMERY COUNTY COMMISSION AND THE MONTGOMERY CITY–COUNTY PERSONNEL BOARD

The Montgomery County Commission and the Montgomery City–County Person-

---

**137.** The court understands that experts from Auburn University at Montgomery are assisting the department in fashioning new procedures.

nel Board are also defendants in both the Johnson and Scott litigation. Although these two defendants are not responsible for any of the described violations of Title VII, the fourteenth amendment as enforced through § 1983, and the 1973 and 1985 consent decrees, they are necessary parties to any relief the court might finally adopt. The commission is responsible for funding the Sheriff's Department, and the personnel board works with the department on many personnel matters. The commission and the personnel board will therefore be required to work with the Sheriff's Department in developing both the temporary and permanent plans for addressing sex and race discrimination in the department.

## IV. CONCLUSION

It is apparent from the evidence in this case that, with regard to race and sex relations in the workplace, the Montgomery County Sheriff's Department has yet to come fully into the last quarter of this century. The conditions within the department are, indeed, redolent of those plantations of the distant past in which women were viewed as merely sexual objects and African–Americans were viewed as limited to performing the least attractive physical labor. Under today's standards of social morality and justice, however, these conditions are intolerable and must be redressed forthwith. Women and blacks in the department should not have to continue to endure under them one day more than is absolutely necessary. Admittedly, the department has a very long way to travel before it can become the "equal opportunity employer" it claims to be.[138] But a first step must be taken, and that first step must be a long one and it must be taken today.

An appropriate judgment will be entered.

## ORDER

This cause is now before the court on the defendants' amended motion requesting that the court reconsider its memorandum opinion of November 27, 1990. The court will deny the motion, but with clarification on the following point.

With regard to the defendants' statute-of-limitations defense to the Scott intervenors' § 1983 claims, the court concluded in its memorandum opinion that the defendants' contention that the six-year period did not apply came too late in the litigation. The parties proceeded throughout the litigation with the understanding that the full six-year period applied and thus that all events after May 26, 1982, were actionable under § 1983.[*] The court noted alternatively that, even if the defendants' new contention were timely, all events after January 9, 1984, would still be actionable under § 1983. The court, therefore, considered all claims arising after May 26, 1982, as timely.

Accordingly, for the above reasons, it is ORDERED that the defendants' motion to reconsider, filed on December 7, 1990, and amended on December 10, 1990, be and it is hereby denied.

## ON MOTION TO ALTER OR AMEND

Upon consideration of the Scott intervenors' motion to alter or amend judgment, filed on December 7, 1990, and amended on December 19, 1990, it is ORDERED that the motion is denied in all remaining respects.

■ The Scott intervenors correctly note that the court did not make any findings with regard to their disparate treatment claim of a pattern and practice of race discrimination in training in the Montgomery County Sheriff's Department. The court therefore now makes those findings, but against the Scott intervenors. The court relies only on the evidence produced at trial.

The Scott intervenors' evidence consisted mainly of a chart showing that, over the

138. Defendants' exhibit 3 at 21.

* In both defendants' supplemental answer filed on September 27, 1988, and the pretrial order filed on January 26, 1989, the defendants expressly stated that they were pleading the six-year statute of limitation to § 1983 claims. The defendants also pleaded the two-year statute of limitations, but to Title VII claims only.

years, very few of the deputies who received training were black. While this chart raises a suspicion that there was intentional discrimination, the chart is insufficient, even in conjunction with all other evidence in the litigation, to convince the court by a preponderance of the evidence that there in fact was. The Scott intervenors also presented evidence of specific instances in which they claim blacks were discriminated against in training; their evidence presented, however, only an outline of the events and thus raised only a suspicion of discrimination. The intervenors did not follow through with sufficient detail to convince the court. For example, the Scott intervenors observe that the Administrator of the County Jail, who is black, has been to only two training schools in his 20 years with the Sheriff's Department; whereas, the Assistant Administrator, who is white, attended two training seminars in 1986. The court is not convinced from these facts, even in conjunction with all the evidence in the litigation, that the department and its officials have intentionally discriminated against the administrator. Finally, the Scott intervenors have presented evidence indicating that training is very important to a deputy's career, but again this evidence, together with all other evidence, is not sufficient to support a claim of intentional discrimination. In conclusion, the court has reviewed all of the Scott intervenors' evidence regarding training, and the court is not convinced of their claim of a pattern and practice of, or class-wide, intentional discrimination in training; indeed, the court is not convinced of any isolated instances of such discrimination beyond those indicated in the memorandum opinion of November 27, 1990.**

** The court would note, however, that in order to devise a nondiscriminatory promotion system it may still be necessary to consider and revise the Sheriff's Department's training procedures and opportunities.